STATE of Wisconsin,
Plaintiff-Respondent,

v.

Charles E. YOUNG,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP2968–CR. Oral argument October 11, 2005.
—Decided July 12, 2006.*

2006 WI 98

(Also reported in 717 N.W.2d 729.)

3

7

8

For the defendant-appellant-petitioner there were briefs and oral argument by *Martha K. Askins,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals,[1] affirming the convictions of Charles Young (Young) for possession of marijuana, resisting an officer, and obstructing an officer. Prior to trial, Young moved to suppress evidence

---

[1] *State v. Young,* 2004 WI App 227, 277 Wis. 2d 715, 690 N.W.2d 866.

of marijuana on grounds that it was obtained pursuant to an illegal seizure. The circuit court for Kenosha County, Michael S. Fisher, Judge, denied Young's motion, finding that a Kenosha police officer had reasonable suspicion to initiate an investigatory stop.

¶ 2. Young raises three issues on appeal. First, he argues the marijuana seized incident to his arrest should have been suppressed because the officer lacked reasonable suspicion when he initiated contact. Second, Young asserts that his conviction for obstruction should be reversed because the officer lacked reasonable suspicion at the time he ordered Young to stop, and therefore, the officer was not acting with lawful authority. Third, Young contends that his conviction for resisting should be reversed because the officer lacked reasonable suspicion when he chased and physically apprehended Young, and therefore, the officer was not acting with lawful authority.

¶ 3. Critical to resolving these issues is the question of when a "seizure" occurs under the Fourth Amendment. Young maintains that a person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," which is the test first articulated in *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). The State takes the position that a person is seized when an officer applies physical force, however slight, to restrain the person's movement or when the person submits to a show of authority. This is the test in *California v. Hodari D.,* 499 U.S. 621, 626 (1991).

¶ 4. In *State v. Kelsey C.R.,* 2001 WI 54, ¶ 33, 243 Wis. 2d 422, 626 N.W.2d 777, this court adopted the *Hodari D.* test "for when a seizure occurs." Nevertheless, Young argues that Article I, Section 11 of the

Wisconsin Constitution provides greater protections than the Fourth Amendment and that this court should join the state courts that choose to follow *Mendenhall* rather than *Hodari D.*

¶ 5. After considering the relative merits of the *Mendenhall* and *Hodari D.* tests, we believe that the two tests can coexist and that the *Hodari D.* test applies when a suspect refuses to submit to a show of authority. On the facts, we reach the following conclusions: First, the Kenosha police officer had reasonable suspicion for an investigatory stop of the parked car in which Young was sitting. We need not decide whether the car and the occupants other than Young were seized. Second, when the officer ordered Young to return to the car after Young started to run away, the officer had reasonable suspicion to believe Young was committing a crime. Third, applying *Hodari D.*, Young was not seized within the meaning of the Fourth Amendment until the officer physically detained him. Accordingly, the officer lawfully seized Young, and we affirm Young's convictions on all three counts.

## I. FACTS AND PROCEDURAL HISTORY

¶ 6. By October 2002 City of Kenosha Police Officer David Alfredson (Alfredson) had been a member of the Kenosha police force for more than seven years. During that entire time he patrolled Area 15, a sector of the city that included 52nd and 53rd Streets and 21st Avenue. Fifty-second Street was the site of two popular bars, The Barn and Coins, and had become "a problem area" for the police. There were problems with fights ("a lot of fights"), drinking in cars, and drug use outside the two establishments. Neighbors had complained to elected officials and law enforcement about people leaving beer bottles in their yards, playing loud music, and

talking boisterously as they came and went. Littering had become so serious that the two bars sent people out after closing to pick up beer bottles to minimize complaints. Fifty-second Street had become a priority area for police patrol, and it was heavily patrolled after 10:00 p.m.

¶ 7. On the evening of October 26, 2002, Officer Alfredson was driving south on 21st Avenue, a narrow residential street around the corner from The Barn. At approximately 11:40 p.m., he spotted an unfamiliar car with Illinois license plates, parked on the right side of the street along with other cars. There were five people sitting in the car. Alfredson did not stop, but continued driving, turning right on 53rd Street.

¶ 8. Alfredson had developed a regular practice of looking for occupied cars as he patrolled the neighborhood near the bars. When he observed an occupied car, he would continue on his patrol and double back some time later to check whether the car was still occupied. If the car was still occupied, he would stop and investigate. He estimated that he had made dozens of similar stops in the preceding year.

¶ 9. Traveling back to 52nd Street, Alfredson stopped near The Barn to break up a heated argument and disperse the participants. He then went back to his marked squad car, turned the corner, and drove again down 21st Avenue. He saw the same car with Illinois plates, still occupied with five people. His interest piqued, Alfredson decided to stop and investigate. It was 11:49 p.m. At the motion to suppress hearing, Alfredson testified:

> [The car] was still occupied with five people in it. That length of time, they would have had time there to park and go out somewhere. They would have more than enough time to go out and do that, so it [aroused] my

12

suspicion for possible drinking or narcotics; so I'll stop and check it out.

¶ 10. Because another car was parked directly behind the car in which Young was seated,[2] Alfredson stopped his squad in the middle of the street next to the car behind Young's car. He illuminated Young's car with his spotlight, and turned on his flashing emergency lights to alert other vehicles that his squad had stopped. He did not activate his red-and-blue rolling lights, but did notify "Dispatch" of the Illinois license.

¶ 11. Before Alfredson could get out of his squad, Young exited his car from the rear passenger-side door. In response, Alfredson got out of his car. At the suppression hearing, Alfredson described what happened next:

> I ordered him back into the vehicle. He turned and started walking away from the vehicle. I then yelled louder. I said, "Get back in that car right now." And I started heading toward him around my squad. He turned and looked at me and started running up toward the house directly to the west of him. He ran up to the porch and tried to get into the door. I was able to close up on to him. I grabbed him by the back, and I was able to grab one arm; and I told him to knock it off, stop right here, police. He turned around and looked at me and got his arm out of his coat. I re-secured the arm, and I had him by the collar. I said, "Stop resisting." He continued to struggle.

Eventually, Alfredson subdued and handcuffed Young.

¶ 12. In the course of the struggle, Young slipped out of the coat he was wearing and threw it towards the door of the house. Later, Alfredson found a vial containing marijuana inside a pocket of the coat.

---

[2] For ease of reference, this car will be referred to as "Young's car" even though he was neither the driver nor the owner.

¶ 13. The Kenosha County District Attorney charged Young with possession of THC as a repeater, in violation of Wis. Stat. §§ 961.41(3g)(e) (2003–04),[3] 961.48(1), and 939.62(1)(b); obstructing an officer as a repeater, in violation of Wis. Stat. §§ 946.41(1) and 939.62(1)(a), for running from Alfredson after being ordered to stop; and resisting an officer as a repeater, in violation of §§ 946.41(1) and 939.62(1)(a), for struggling with Alfredson when Alfredson tried to arrest him.

¶ 14. Young pleaded not guilty and moved to suppress the marijuana, arguing Alfredson lacked reasonable suspicion for an investigatory stop, and thus, the evidence was obtained pursuant to an illegal stop. The circuit court denied Young's motion, finding that the officer had reasonable suspicion at the time he initiated the investigatory stop.

¶ 15. After a one-day trial, the jury found Young guilty of all three counts. The circuit court sentenced Young to two and one-half years for possession of THC, with initial confinement of one and one-half years and one year of extended supervision. It withheld sentence and imposed two years probation consecutive to Young's prison sentence for the counts of obstructing and resisting.

¶ 16. Young appealed the denial of his motion to suppress. The court of appeals affirmed. *State v. Young,* 2004 WI App 227, 277 Wis. 2d 715, 690 N.W.2d 866. Applying *Hodari D.,* the court of appeals held that Alfredson did not seize Young until he grabbed him on the porch of the house, by which time Alfredson had either reasonable suspicion or probable cause of Young

---

[3] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

committing a crime. *See Young*, 277 Wis. 2d 715, ¶¶ 18–19. Notably, although the court of appeals affirmed the circuit court, it expressed serious doubt about the wisdom of following *Hodari D.*, stated a preference for the *Mendenhall* test for seizure, and urged this court to reconsider its adoption of *Hodari D. See Young*, 277 Wis. 2d 715, ¶¶ 20–26. We ultimately accepted review.

## II. STANDARD OF REVIEW

¶ 17. Whether a person has been seized is a question of constitutional fact. *State v. Williams*, 2002 WI 94, ¶ 17, 255 Wis. 2d 1, 646 N.W.2d 834. As such, we accept the circuit court's findings of evidentiary or historical fact unless they are clearly erroneous, but we determine independently whether or when a seizure occurred. *See id.* Similarly, in reviewing a motion to suppress, we employ a two-step analysis. *State v. Dubose*, 2005 WI 126, ¶ 16, 285 Wis. 2d 143, 699 N.W.2d 582. We will uphold the circuit court's findings of fact unless clearly erroneous. *Id.* Whether those facts constitute reasonable suspicion, however, is a question of law we review de novo. *Id.*

## III. DISCUSSION

¶ 18. The Fourth Amendment of the United States Constitution[4] and Article I, Section 11 of the

---

[4] In relevant part, the Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

15

Wisconsin Constitution[5] protect people from unreasonable searches and seizures. Because not all police-citizen contacts constitute a seizure, however, many such contacts do not fall within the safeguards afforded by the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 13 (1968); *Williams,* 255 Wis. 2d 1, ¶ 20. As long as a reasonable person would have believed he was free to disregard the police presence and go about his business, there is no seizure and the Fourth Amendment does not apply. *Florida v. Bostick,* 501 U.S. 429, 434 (1991); *see Michigan v. Chesternut,* 486 U.S. 567, 573 (1988); *Williams,* 255 Wis. 2d 1, ¶ 4. Generally, therefore, police-citizen contact becomes a seizure within the meaning of the Fourth Amendment "when an officer 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . .'" *Williams,* 255 Wis. 2d 1, ¶ 20 (quoting *Mendenhall,* 446 U.S. at 552).

¶ 19. As implied by the *Williams* decision, this court ordinarily adopts and follows the Fourth Amendment jurisprudence of the United States Supreme Court.

¶ 20. The Supreme Court and this court have recognized two types of seizure. The first type, an investigatory or *Terry* stop,[6] usually involves only temporary questioning and thus constitutes only a minor infringement on personal liberty. An investigatory stop is constitutional if the police have reasonable suspicion

---

[5] In relevant part, Article I, Section 11 states: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated . . . ." Wis. Const. art. I, § 11.

[6] *See Terry v. Ohio,* 392 U.S. 1 (1968).

that a crime has been committed, is being committed, or is about to be committed.[7] *State v. Waldner,* 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). An investigatory stop, though a seizure, allows police officers to briefly "detain a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Id.* at 55.

¶ 21. Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot. *Id.* A mere hunch that a person has been, is, or will be involved in criminal activity is insufficient. *Terry,* 392 U.S. at 27. On the other hand, "police officers are not required to rule out the possibility of innocent behavior before initiating a brief stop." *State v. Anderson,* 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). As we have explained:

> [S]uspicious conduct by its very nature is ambiguous, and the [principal] function of the investigative stop is to quickly resolve that ambiguity. Therefore, if any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry.

---

[7] The legislature codified the standard for an investigatory stop in Wis. Stat. § 968.24, which provides:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

17

*Anderson,* 155 Wis. 2d at 84. The detention, however, must be no longer than necessary to clarify the ambiguity. *See Florida v. Royer,* 460 U.S. 491, 500 (1983); *State v. Griffith,* 2000 WI 72, ¶ 54, 236 Wis. 2d 48, 613 N.W.2d 72.

¶ 22. The second type of seizure, a full-blown arrest, is a more permanent detention that typically leads to "a trip to the station house and prosecution for crime . . . ." *Terry,* 392 U.S. at 16. An arrest is not constitutionally justified unless the police have probable cause to suspect that a crime had been committed. *Royer,* 460 U.S. at 496. Probable cause requires that an arresting officer have sufficient knowledge at the time of the arrest to "lead a reasonable police officer to believe that the defendant probably committed or was committing a crime." *State v. Secrist,* 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999). Whereas a mere hunch is insufficient to establish reasonable suspicion, reasonable suspicion is insufficient to establish probable cause. *Id.* Inevitably, the lines between hunch, reasonable suspicion, and probable cause are fuzzy, with each case requiring an examination of the facts.[8] That being said, probable cause does not require proof "beyond a reasonable doubt or even that guilt is more likely than not." *See id.*

¶ 23. Before we determine whether Officer Alfredson had either reasonable suspicion or probable

---

[8] As the United States Supreme Court has acknowledged: "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible." *Ornelas v. United States,* 517 U.S. 690, 695 (1996). "They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (internal punctuation omitted).

cause to seize Young, it is necessary to address the question of *when* Alfredson seized Young. The moment of "seizure" is critical for two reasons: (1) it determines when Fourth Amendment and Article I, Section 11 protections become applicable; and (2) it limits the facts we may consider in evaluating whether Alfredson had reasonable suspicion to stop Young, which in turn affects whether Alfredson had probable cause to arrest Young.

¶ 24. There is no doubt Alfredson seized Young when he physically detained and handcuffed Young after the scuffle on the porch. This action clearly restrained Young's liberty, led to a custodial arrest, and culminated in prosecution. *See Terry*, 392 U.S. at 16.

¶ 25. The more difficult question is whether any of Alfredson's actions prior to the arrest constituted a seizure. Was Young "seized" in a constitutional sense when Alfredson pulled up behind Young's car, activated his emergency flashers, and put his spotlight on the car? Was Young seized when Alfredson first ordered Young to return to the car? Was Young seized when Alfredson ordered Young a second time, but in a louder voice, to return to the car? Was Young seized when Alfredson began chasing Young? Or, did the seizure not occur until Alfredson made physical contact with Young on the porch?

A. When Was Young Seized?

■■■■

¶ 26. Under *Hodari D.* and *Kelsey,* an uncomplied-with show of authority cannot constitute a seizure. *Hodari D.,* 499 U.S. at 629; *Kelsey,* 243 Wis. 2d 422, ¶ 33. Thus, if *Hodari D.* applies, Charles Young was not seized when Alfredson illuminated his car with the spotlight; he was not seized either time Alfredson ordered him to

return to the car; and he was not seized when Alfredson began to chase him. *If* any or all of these actions constituted a show of authority, they did not effect a seizure because Young did not comply with any of them. *Hodari D.* compels the conclusion that Young was not seized until Alfredson physically apprehended him on the porch of the house. Under *Hodari D.* there seems to be no question that the circuit court correctly denied Young's motion to suppress the marijuana, so long as the State could show reasonable suspicion at some point prior to the seizure.

¶ 27. Young, however, argues that we should reject *Hodari D.* and interpret Article I, Section 11 of the Wisconsin Constitution to afford greater protections to individual liberty interests than does the Fourth Amendment. In support of his position, Young argues that the defect in *Hodari D.* is that it threatens an individual's privacy rights and liberty interests by unduly restricting the scope of the Fourth Amendment. More specifically, Young argues *Hodari D.* (1) isolates from scrutiny the initial stages in police-citizen encounters; (2) shifts the focus of the Fourth Amendment from police conduct to the citizen's response to police conduct; and (3) fails to recognize that pursuit and attempted arrest substantially interfere with personal liberty and should therefore be subject to the Fourth Amendment.

¶ 28. Young maintains that a better test of when a seizure occurs is the "objective" *Mendenhall* standard; that is, a seizure occurs when, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. *See Mendenhall,* 446 U.S. at 554. Applying *Mendenhall,* Young contends he was seized the moment Alfredson pulled up behind his car, turned on the flashers, and

illuminated Young's car with the spotlight, because at that moment no reasonable person would have felt free to disregard the police presence.

¶ 29. The State insists that Alfredson did not seize Young until he physically apprehended Young. Predictably, the State urges us to reaffirm our commitment to *Hodari D.* and interpret the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution coextensively. In response to Young's criticism of *Hodari D.,* the State argues that the better policy is to require submission to a show of authority before Fourth Amendment protections apply. This procedure gives officers advance knowledge of what actions are constitutional, because officers have to assume people will obey and that the exclusionary rule will apply if the police exceed their authority. Encouraging people to comply with police orders also minimizes the risks of police pursuit. In sum, the State argues Article I, Section 11 should be interpreted to follow the Fourth Amendment as interpreted in *Hodari D.*

****

¶ 30. Typically, this court interprets Article I, Section 11 of the Wisconsin Constitution in tandem with the Fourth Amendment jurisprudence of the United States Supreme Court. *Griffith,* 236 Wis. 2d 48, ¶ 24 n.10. Of course, we do not always follow the Supreme Court's lead,[9] and the Court does not require us to do so when we supplement the United States

---

[9] *See State v. Knapp,* 2005 WI 127, ¶ 59, 285 Wis. 2d 86, 700 N.W.2d 899; *State v. Dubose,* 2005 WI 126, ¶¶ 40–41, 285 Wis. 2d 143, 699 N.W.2d 582 (noting that although the due process clauses of Article I, Section 8 of the Wisconsin Constitution and the Fourteenth Amendment to the United States Constitution are similar, we retain the right to interpret our constitution to provide greater protections).

Constitution's protections with protections under our own constitution. *See Michigan v. Long,* 463 U.S. 1032, 1041 (1983) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").[10] We embrace the Fourth Amendment jurisprudence of the United States Supreme Court when we perceive soundness in Supreme Court analysis and value in uniform rules. We follow that course in this case.

¶ 31. In deciding whether to adopt the *Hodari D.* or *Mendenhall* framework for seizure analysis under the Wisconsin Constitution, we believe it is necessary to consider how these cases relate to one another, as well as the public policy reasons for and against following *Hodari D.*

### 1. Can *Hodari D.* and *Mendenhall* Coexist?

¶ 32. *Mendenhall* defined a seizure as occurring "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554. In *Mendenhall* Drug Enforcement Administration (DEA) agents investigating narcotics trafficking in the Detroit Metropolitan Airport approached Mendenhall after she disembarked from a Los Angeles flight because Mendenhall's actions fit the profile of a drug courier. *Id.* at 547. The agents identified themselves and asked to see Mendenhall's identification and airline ticket; they discovered that the two bore different names. *Id.* at 547–48. Upon returning both documents

---

[10] *See also Knapp,* 285 Wis. 2d 86, ¶ 57 (listing United States Supreme Court decisions that acknowledge the right of state courts to afford greater protections under state constitutions).

to Mendenhall, the agents asked her to accompany them to the DEA office, which she did. *Id.* at 548. Upon reaching the DEA office, the agents also asked for and received Mendenhall's consent to search her handbag and her person. *Id.* at 548–49. In the course of the search, the agents found heroin. *Id.* at 549. Before trial, Mendenhall moved to suppress the heroin, claiming she had been seized when the DEA agents first approached her and that they lacked reasonable suspicion at the inception of the stop.

¶ 33. Justice Stewart concluded—although a majority of the Court did not join him—that the agent's approach and Mendenhall's cooperation did *not* constitute a seizure, because a person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," and that given the conduct of the DEA agents, a reasonable person would have felt free to walk away. *Id.* at 554–55; *see id.* at 560 n.1 (Powell, J., concurring).[11]

¶ 34. Subsequently, a majority of the Court adopted Justice Stewart's *Mendenhall* test for seizure. *See INS v. Delgado,* 466 U.S. 210, 215 (1984); *Chesternut,* 486 U.S. at 573; *Bostick,* 501 U.S. at 434. These cases make clear that either physical force or a show of authority sufficient to give rise to a belief in a reasonable person that he was not free to leave, is necessary for a seizure. *Bostick,* 501 U.S. at 434; *Chesternut,* 486 U.S. at 573; *Delgado,* 466 U.S. at 215.

---

[11] Three members of the Court (Chief Justice Burger and Justices Powell and Blackmun) concluded that the initial questioning constituted a seizure but that the agents had reasonable suspicion to make the stop. *United States v. Mendenhall,* 446 U.S. 544, 546 (1980).

¶ 35. In *Delgado* and *Bostick,* as in *Mendenhall,* the individuals did not flee in response to an official show of authority. In *Delgado* the plaintiffs answered questions by INS agents at their workplace. *Delgado,* 466 U.S. at 220–21. The Court concluded that none of the plaintiffs had been seized because, in view of all the circumstances surrounding the incident, a reasonable person would not have believed that he or she was "not free to continue working or to move about the factory." *Id.* In *Bostick* the defendant, a passenger on a bus, challenged the search of his luggage as nonconsensual, claiming that police presence on the bus created a coercive atmosphere that induced consent. *Bostick,* 501 U.S. at 435. The Court reversed the Florida Supreme Court's holding that suppression of cocaine produced by the search was appropriate, and it remanded the case to state court for a determination of whether a reasonable person would have felt free to "decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. In both cases, the Court applied the *Mendenhall* test for seizure because the individuals cooperated.

¶ 36. The Court also applied the *Mendenhall* test in *Chesternut* where the defendant ran when he saw a police car and was observed discarding controlled substances as he ran. The Court concluded that the police had not made a sufficient show of authority because, although a police car slowly followed Chesternut, the police did not activate a siren or flashers, did not order Chesternut to stop, did not display any weapons, and did not maneuver the police car in any way to limit the defendant's movement. *Chesternut,* 486 U.S. at 575. Absent a show of authority, there was nothing for Chesternut to submit to, and no possibility of seizure.

24

¶ 37. *Mendenhall* is the appropriate test for situations where the question is whether a person submitted to a police show of authority because, under all the circumstances surrounding the incident, a reasonable person would not have felt free to leave. If a reasonable person would have felt free to leave but the person at issue nonetheless remained in police presence, perhaps because of a desire to be cooperative, there is no seizure. As this court noted in *Williams,* "most citizens will respond to a police request," and "the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Williams,* 255 Wis. 2d 1, ¶ 23 (quoting *Delgado,* 466 U.S. at 216).

¶ 38. *Hodari D.,* which was foreshadowed by Justice Kennedy's concurrence in *Chesternut,* supplements the *Mendenhall* test to address situations where a person flees in response to a police show of authority. *See Hodari D.,* 499 U.S. at 628. In *Hodari D.* police officers in an unmarked squad car rounded a corner in a high-crime neighborhood and came upon a group of youths who immediately dispersed at the sight of the car. *Hodari D.,* 499 U.S. at 622–23. One of the officers chased Hodari on foot. *Id.* at 623. Shortly *before* the officer caught the suspect, Hodari threw away a rock of crack cocaine. *Id.* Hodari argued he was seized once he saw the officer pursuing him and that the evidence of the cocaine should be suppressed as the fruit of an illegal seizure. *Id.* The Court disagreed, concluding that although the officer's pursuit constituted a show of authority and although *the officer lacked reasonable suspicion* when he initiated the pursuit, Hodari was not seized until the officer tackled him, because Hodari did not submit to the show of authority. *Id.* at 629. Hence,

Hodari abandoned the cocaine before he was seized, and it was admissible. *Id.*

¶ 39. Because *Mendenhall* and its progeny did not confront the situation where a person refuses to yield to a show of authority, the *Hodari D.* court found the *Mendenhall* test insufficient:

> [The *Mendenhall* test] says that a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary,* but not a *sufficient,* condition for seizure—or, more precisely, for seizure effected through a "show of authority." *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person. Application of this objective test was the basis for our decision in . . . *Chesternut* . . . where we concluded that the police cruiser's slow following of the defendant did not convey the message that he was not free to disregard the police and go about his business. We did not address in *Chesternut,* however, the question whether, if the *Mendenhall* test was met—if the message that the defendant was not free to leave *had* been conveyed—a Fourth Amendment seizure would have occurred.

*Hodari D.,* 499 U.S. at 628. The *Mendenhall* test applies when the subject of police attention is either subdued by force or submits to a show of authority. Where, however, a person flees in response to a show of authority, *Hodari D.* governs when the seizure occurs. Deciding when a seizure occurs is important because the moment of a seizure limits what facts a court may consider in determining the existence of reasonable suspicion for that seizure.

¶ 40. The *Hodari D.* test does not supersede the *Mendenhall* test, it supplements the *Mendenhall* test. *United States v. Drayton* confirms this.[12] *Drayton,* 536 U.S. 194, 201–02 (2002). Decided more than ten years after *Hodari D., Drayton* retains a *Mendenhall*-inspired test for seizure, adapted to a police-citizen encounter on a bus. Under *Drayton,* a person is seized if a reasonable person would not "feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 202 (quoting *Bostick,* 501 U.S. at 436). Unlike *Hodari D.,* the defendant in *Drayton* did not flee or attempt to flee from the officers. In a similar vein, this court cited both *Mendenhall* and *Hodari D.* in *Williams.* Thus, the *Mendenhall* and *Hodari D.* tests are compatible and can coexist. The applicable test depends upon the facts.[13]

2. Policy Considerations Encircling *Hodari D.*

¶ 41. Justice Scalia, the author of *Hodari D.,* gives two policy reasons in support of the *Hodari D.* test for seizure. *Hodari D.,* 499 U.S. at 627. First, by postponing the moment at which the protection of the exclusionary rule becomes available to an individual who flees from the police until there has been a seizure, *Hodari D.* encourages compliance with police orders, thereby obviating the need for police pursuits that pose risks to the public. *Id.* Instead of employing self-help remedies

---

[12] *See also Kaupp v. Texas,* 538 U.S. 626, 629–30 (2003).

[13] Justice Bradley's dissent ignores the fact that a court does not reach the *Hodari D.* test until a defendant refuses to submit to a police show of authority. Curiously, her dissent relies upon *Kaupp v. Texas,* 538 U.S. 626 (2003), a *per curiam* opinion, to intimate that perhaps the Supreme Court has abandoned *Hodari D.* In response, we note that there was no question of flight in *Kaupp;* the defendant instantaneously submitted to the police show of authority. *See Kaupp,* 538 U.S. at 628.

like flight, citizens should seek relief from unlawful police interference in the courts through use of the exclusionary rule and, if need be, civil rights suits.

¶ 42. Second, although *Hodari D.* restricts the reach of the Fourth Amendment, Justice Scalia contends that it will have no adverse effect upon the privacy rights and liberty interests of the citizenry. *See id.* One purpose of the Fourth Amendment and its exclusionary rule is to deter illegal government activity. *State v. Knapp,* 2005 WI 127, ¶ 22, 285 Wis. 2d 86, 700 N.W.2d 899 *(Knapp II).* "Unlawful orders will not be deterred . . . by sanctioning through the exclusionary rule those [unlawful orders] that are *not* obeyed." *Hodari D.,* 499 U.S. at 627. Police officers shout "Stop!" or "Get back in that car right now," expecting to be obeyed; the deterrent effect of the exclusionary rule is still realized if it applies only to "successful seizures" resulting from these orders. *Id.* In short, because the majority of people confronted with a direct command will obey the command, police officers must understand that the exclusionary rule will constrain their conduct in these situations.

¶ 43. Perhaps the most powerful criticism of *Hodari D.* can be found in Justice Stevens' dissent. Much of the scholarly criticism of *Hodari D.* simply amplifies the points he makes.[14] First, Justice Stevens chastises the majority for adopting too literal a construction of the term "seizure" because it limits the application and protective function of the Fourth Amendment to the

---

[14] *See e.g.,* 4 Wayne R. LaFave, *Search and Seizure* § 9.4(d) (4th ed. 2004); Tracy Maclin, *"Justice Thurgood Marshall: Taking the Fourth Amendment Seriously,"* 77 Cornell L. Rev. 723, 745–52 (1992); Thomas K. Clancy, *"The Future of Fourth Amendment Seizure Analysis after Hodari D. and Bostick,"* 28 Am. Crim. L. Rev. 799 (1991).

common law conception of arrest, which required physical contact. *Hodari D.,* 499 U.S. at 631–33 (Stevens, J., dissenting). Instead, Justice Stevens argues that because an attempted arrest also infringes upon an individual's privacy and liberty, the Fourth Amendment should apply to unlawful attempted arrests. *Id.* at 631–32, 637.

¶ 44. Second, Justice Stevens criticizes the majority decision as inconsistent with the Court's precedent in *Katz v. United States,* 389 U.S. 347 (1967) (holding that the Fourth Amendment protects against "seizures" of oral statements obtained by electronic surveillance), and *Terry* (holding that the Fourth Amendment extends to investigatory stops that fall short of a common-law arrest), both of which allegedly interpreted the Fourth Amendment expansively to afford greater protection to liberty interests and privacy rights. *Hodari D.,* 499 U.S. at 633–37 (Stevens, J., dissenting).

¶ 45. Third, Justice Stevens criticizes the majority for shifting the analysis of whether a seizure occurs from an objective analysis of how a reasonable person would interpret the police officer's conduct to the individual's reaction to that conduct. *Id.* at 641, 643. Thus, police officers can create reasonable suspicion or even probable cause where there was none by coercively infringing upon the individual's right to be let alone, and waiting for an arguably suspicious reaction.[15] *Id.* at 645–46 & n.18.

---

[15] Stated otherwise, Professor LaFave suggests that *Hodari D.* will encourage unlawful displays of force that " 'turn a hunch into reasonable suspicion by inducing the conduct justifying the suspicion,' that is, the flight of the individual ultimately stopped." 4 Wayne R. LaFave, *Search and Seizure* § 9.4(d), at 461–62 (4th ed. 2004) (quoting *Commonwealth v. Thibeau,* 429 N.E.2d 1009 (Mass. 1981)).

¶ 46. Adding to these arguments about individual liberty, Justice Stevens maintains that the majority's decision abandons a standard that permits police officers to "determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.* at 643–44. Because of these shortcomings, Justice Stevens would reject the *Hodari D.* test, and instead require a court to evaluate the constitutionality of police conduct based on the conditions at the time the officer took action, when liberty is first restrained and privacy first infringed. *Id.* at 645.

¶ 47. Although we recognize the strength of these critiques, we remain unconvinced that *Hodari D.* should be discarded. We acknowledge the potential that police officers may rely upon *Hodari D.* to manufacture reasonable suspicion by attempting to seize individuals in expectation that they will flee. This is not such a case. There is no indication in the record that Officer Alfredson was attempting to induce flight or other suspicious conduct. On the facts here, the concerns prompting the criticism of *Hodari D.* appear unwarranted.

¶ 48. We disagree that adhering to *Hodari D.* will leave police officers unable to determine in advance whether contemplated conduct will implicate the Fourth Amendment. *Contra Hodari D.,* 499 U.S. 643–44 (Stevens, J., dissenting). As *Hodari D.* and other decisions suggest, most people will acquiesce with a police show of authority, in which case the Fourth Amendment applies and the exclusionary rule will exclude any evidence obtained in the absence of reasonable suspicion. *See id.* at 627; *Drayton,* 536 U.S. at 205. Consequently, before initiating an investigatory stop, police officers must presume that the target of the stop will

comply and the protections of the Fourth Amendment's exclusionary rule will have full effect.

¶ 49. The exclusionary rule is the primary means by which Fourth Amendment rights are protected. Its primary purpose is to deter future unlawful police conduct. *See Mapp v. Ohio,* 367 U.S. 643, 656 (1961); *Knapp II,* 285 Wis. 2d 86, ¶ 22. The exclusionary rule is not absolute. *Id.,* ¶ 23. The benefits of any increased deterrence must be weighed against the substantial social costs exacted. *Id.,* ¶ 22. The exclusionary rule "applies only in contexts 'where its remedial objectives are thought most efficaciously served.' " *Id.,* ¶ 23 (quoting *Pa. Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 363 (1998)). Because a police officer cannot know in advance that a suspect will flee or not comply with a show of authority, and because a police officer must presume that people will comply with orders and thus the officer must adhere to the Fourth Amendment to prevent the exclusion of evidence, we fail to see how rejecting *Hodari D.* will further deter Fourth Amendment violations. The benefits of extending the exclusionary rule to situations before seizure, when a person does not comply with a police order, appear to be negligible.

¶ 50. Under *Hodari D.* the protection afforded by the exclusionary rule remains unless the person confronted by a show of authority chooses to abandon its protective embrace by opting for self-help flight. Under *Hodari D.* courts have created an incentive for people to obey police orders without creating an incentive for police to violate the Fourth Amendment. Under *Hodari D.* courts remain the final arbiter of whether police conduct violates the Fourth Amendment, not the citizen on the street.

31

¶ 51. There is one additional policy consideration for following the *Hodari D.* test: stare decisis. Less than five years ago this court elected to follow *Hodari D. Kelsey C.R.,* 243 Wis. 2d 422, ¶¶ 30–33. Absent special justification,[16] such as a showing that our earlier adoption of *Hodari D.* has resulted in the widespread erosion of liberty interests, we decline to overrule *Kelsey C.R.*

■■■■

¶ 52. Given that Young fled in response to a show of authority, *Hodari D.* supplies the proper analysis to evaluate when Young was seized. Applying *Hodari D.,* we conclude Young was not seized until Alfredson physically apprehended him on the porch because Young did not submit to any show of authority prior to that moment.

B. Was There Reasonable Suspicion or Probable Cause to Justify the Seizure?

¶ 53. Our analysis cannot end here because this case is unlike *Hodari D.* in one significant respect: Young did not abandon the contraband before he was seized. Thus, we cannot rely on abandonment as the basis for admitting the incriminating evidence. Instead, we must inquire whether Alfredson's search of Young's coat was justified.

---

[16] We have recognized several criteria for departing from precedent, including: (1) changes or developments in the law that undermine the rationale behind a decision; (2) the need to make a decision correspond to newly ascertained facts; (3) a showing that a decision has become detrimental to coherence and consistency in the law; (4) a showing that a decision is unsound in principle; and (5) a showing that a decision is unworkable in practice. *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 2003 WI 108, ¶¶ 98–99, 264 Wis. 2d 60, 118, 665 N.W.2d 257.

¶ 54. We begin with the rule that warrantless searches are per se unreasonable under the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution. *Williams,* 255 Wis. 2d 1, ¶ 18. There are, however, " 'specifically established and well-delineated' exceptions to the Fourth Amendment's warrant requirement." *Id.* (quoting *Katz,* 389 U.S. at 357). One of these exceptions is for searches incidental to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 753 (1969); *see also* Wis. Stat. §§ 968.10 (authorizing a search incident to arrest) and 968.11 (authorizing a search incident to arrest for the purpose of, inter alia, "[d]iscovering and seizing the fruits of the crime").

¶ 55. There is a similar, albeit more limited, exception for searches incident to an investigatory stop. *See Terry,* 392 U.S. at 27; *State v. Guy,* 172 Wis. 2d 86, 93–94, 492 N.W.2d 311 (1992). If a police officer reasonably suspects a person of committing a crime, he may frisk the person if he reasonably believes the person is armed and if a reasonable officer would have believed the person posed a safety risk to the officer or others. *Id.* at 93–94; *see also* Wis. Stat. § 968.25.

¶ 56. We need not resolve whether Alfredson's search of Young's coat was a frisk or a search, because we conclude that Alfredson had probable cause to believe Young had violated Wis. Stat. § 946.41(1)—obstructing an officer—by the time he arrested Young on the porch, thereby justifying a full-blown search.

¶ 57. To prove Young guilty of obstruction, the State was required to show: (1) Young obstructed an officer, meaning his conduct prevented or made more difficult Alfredson's performance of his duties;

(2) Alfredson was acting in an official capacity; (3) Alfredson was acting with lawful authority; and (4) Young knew Alfredson was acting in his official capacity and with lawful authority and that his conduct would obstruct the officer. *See* Wis JI—Criminal 1766. Young contests the sufficiency of the evidence as to the third element, whether Alfredson had reasonable suspicion when he ordered Young to return to the car. Without reasonable suspicion at the time he ordered Young to return to the car, Alfredson would have lacked lawful authority. *See id.*

■■■■

¶ 58. To determine whether Officer Alfredson had reasonable suspicion to initiate an investigatory stop, we examine the facts leading up to the stop to determine whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion. *See Maryland v. Pringle,* 540 U.S. 366, 371 (2003).

■■■■

¶ 59. An officer need not dispel all innocent inferences before conducting an investigatory stop. *Anderson,* 155 Wis. 2d at 84. Indeed, the suspicion necessary to justify an investigatory stop is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). As a leading commentator notes in regard to reasonable suspicion:

> Such generalities as "he didn't look right" will not suffice; like Officer McFadden in *Terry,* the officer must relate what he has observed, and, when appropriate, indicate why his knowledge of the crime problem and the habits of the residents on his beat or of the practices of those planning or engaging in certain forms of

criminal conduct gives special significance to what he observed.

4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 476 (4th ed. 2004).

¶ 60. Alfredson testified at a preliminary examination, at a suppression hearing, and at the jury trial. His testimony was consistent.

¶ 61. First, Alfredson testified to his knowledge of the neighborhood. It was "a problem area" with several nearby bars. It was known for fights, drinking in cars, littering, and drug use. The police had made the area a priority for patrol, especially after 10:00 p.m., because of these problems. Many cars were in the area on Saturday, October 26, 2002.

¶ 62. Second, Alfredson testified that he was an experienced officer who had patrolled this area for seven years. He was familiar with local automobiles and local practices. Alfredson understood there was a correlation between people remaining in their cars for an extended time and the use of alcohol and narcotics in those cars. Based on his nightly patrols, Alfredson knew this type of activity was common in the neighborhood.

¶ 63. Third, Alfredson testified to the facts that aroused his suspicion. Specifically, five people had lingered in an unfamiliar car with Illinois license plates for five to ten minutes. It was nearly midnight. Alfredson did not see these people get out to go to a bar or a local party, or come back from one. He did not see them drop off one of their number. If any of the occupants were going to spend the night at a dwelling on 21st Avenue, they could have left the car and gone inside. Alternatively, the whole group might be driving back to Illinois after an evening of drinking. Perhaps they were still drinking in the car. Five people sitting in a car for about ten minutes, around the corner from a major bar,

shortly before midnight: The facts were not necessarily unusual, but they were not usual, either.

¶ 64. Although there are innocent explanations for why five people would be sitting in a car for five to 10 minutes, Alfredson was not required to rule out all these potential explanations before initiating his investigation. The officer described the particular facts that made him suspicious and linked those facts to his seven years of experience patrolling the neighborhood. At the time Alfredson stopped his squad car, turned on his flashers, and illuminated Young's car, we think there were sufficient facts for Alfredson to initiate an investigatory stop.[17]

¶ 65. Determining that Officer Alfredson had reasonable suspicion to initiate an investigatory stop is different from determining that he "seized" the vehicle and its occupants. That is a close question with respect to the persons in the car other than Young. When a marked squad car pulls up behind a car, activates emergency flashers, and points a spotlight at the car, it certainly presents indicia of police authority.[18] Yet, not every display of police authority rises to a "show of

---

[17] The court of appeals believed it was doubtful whether Alfredson had reasonable suspicion to detain Young and the occupants of the car based on these facts. *Young*, 277 Wis. 2d 715, ¶ 10 n.4.

[18] Although a police officer's use of a spotlight in conjunction with emergency flashers may constitute a show of authority, we note that many courts have concluded that the use of a spotlight is not a show of authority sufficient to effect a seizure. *See State v. Baker*, 107 P.3d 1214, 1216–18 (Idaho 2004) (use of spotlight is no seizure; collecting cases holding the same); *State v. Young*, 957 P.2d 681, 688–89 (Wash. 1998) (finding that under the totality of the circumstances, illuminating the defendant

authority" that constitutes a seizure. As both *Mendenhall* and *Hodari D.* teach, not every police action, initiative, display of authority, or interaction with a citizen would cause a reasonable person to believe that he was not free to leave. A police officer's actions must be assessed in view of all the circumstances surrounding the incident.

¶ 66. Not every contact between the police and a citizen constitutes a seizure. In this case, the officer did not stop a moving vehicle or a vehicle about to move. *Compare State v. Harris*, 206 Wis. 2d 243, 557 N.W.2d 245 (1996). Young's car was already stopped and had been parked for some time. When Alfredson's squad approached Young's car, he was not able to pull in behind it, out of the lane of traffic. This presented him with two choices. He could park his car at some distance and proceed on foot, or he could stop in the lane of traffic and turn on some warning lights.

¶ 67. Young concedes that Alfredson had authority to approach the suspect car on foot to check it out and make inquiry. We think, however, that it would be unreasonable to expect an officer, traveling alone near midnight, in a problem area, to leave his squad car and approach a suspicious car full of people, without being able to see clearly the situation into which he was walking. We think this would ask too much and would discourage effective law enforcement.[19] *Cf. Terry*, 392 U.S. at 23 (noting "it would be unreasonable to require

with a spotlight does not a seizure make). We are mindful that emergency flashers are often used in situations that have nothing to do with investigating criminal activity, and spotlights are likely to be used at night.

[19] At oral argument, Young's attorney suggested that if Alfredson had parked his car down the street or around the corner and approached Young's car on foot to direct inquiries to

that police officers take unnecessary risks in the performance of their duties").

¶ 68. Instead, Alfredson turned on his emergency flashers and a spotlight, two actions consistent with a concern for the safety of passing motorists and the safety of the officer. We believe the flashing lights are the same lighting the officer would have used if he had stopped to aid a motorist. The officer never turned on his red-and-blue rolling lights.

¶ 69. On these facts, we are reluctant to conclude that the positioning of the officer's car, together with the lighting he employed, necessarily involved such a show of authority that "a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554. We are not required to make that determination in this case.

¶ 70. Even if we were to determine that the officer's show of authority constituted a seizure and that he did not have reasonable suspicion for an investigatory stop, it would not help Young. Young's situation is governed by a different rule because of *Hodari D.*

¶ 71. At the very moment Alfredson illuminated the spotlight, Young got out of his car. This might have been a coincidence, but a reasonable officer could suspect that it was not. In response, the officer called out to Young. This call was either not heard or it was ignored. If there were any doubt that Alfredson had reasonable suspicion before he illuminated the car, there can be no doubt that Alfredson had reasonable suspicion after

the occupants there would have been no Fourth Amendment violation. Such a suggestion strikes us as impractical and an unjustified impediment to effective police work.

Young got out of the car and disregarded Alfredson's first order.

¶ 72. One might argue that at the moment Young exited the car, a reasonable officer in Alfredson's position would have had no way of knowing what the person intended. Alfredson's first order for Young to return to the car may be viewed as a reasonable attempt to clarify the ambiguity in Young's conduct. It is also a standard tactic for police officer safety. Once Young disregarded the command and began to flee, Alfredson had reasonable suspicion to stop Young.

¶ 73. Officer Alfredson testified that after he ordered Young to return to the car the first time, Young "turned and started walking away." We acknowledge that people may have the right to disregard the police and walk away without giving rise to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Where a police officer, "without reasonable suspicion or probable cause, approaches an individual, the individual has a right *to ignore* the police and *go about his business*." *Id.* (emphasis added). Under these circumstances, "any 'refusal *to* cooperate, without more, does not furnish the minimal level of objective justification needed for a [stop] or [arrest].' " *Id.*

¶ 74. Plainly, however, a person who disregards a police officer's order assumes the risk that the officer cannot establish that he had reasonable suspicion for an investigatory stop. The person who believes he is exercising his Fourth Amendment rights by disregarding the officer may be subjecting himself to criminal prosecution if the officer has reasonable suspicion to make a stop.[20]

---

[20] We note that the Supreme Court has held that the Fourth Amendment is not offended when a police officer asks a person

¶ 75. Young's actions were not consistent with disregarding the police presence and going about his business. Young had remained in the car for at least five to 10 minutes. The instant Alfredson illuminated Young's car with the spotlight, Young altered his course of conduct and got out of the car. It is improbable that the timing of Alfredson's appearance and Young's abrupt departure, with no word to the officer, were mere coincidence. Young's action smacked of evasion and flight, which can properly give rise to reasonable suspicion when viewed in the totality of the circumstances. *See Wardlow,* 528 U.S. at 125. Thus, we conclude that Young's evasive action, set against the above-described facts, reinforced reasonable suspicion.

¶ 76. Because Alfredson had reasonable suspicion before he issued his second command for Young to return to the car, we conclude Alfredson was acting with lawful authority when he issued this second order. Thus, there is sufficient evidence in the record for a jury to have convicted Young of obstruction.

■■■

¶ 77. As a result of this conclusion, it also follows that when Young disregarded Alfredson's second command to return to the car, Alfredson had probable cause to arrest Young for obstruction. Because a search incident to arrest is one of the exceptions to the warrant requirement of the Fourth Amendment, Alfredson lawfully searched Young's jacket, in which he found the vial of marijuana. *See Chimel,* 395 U.S. at 763. Thus, the circuit court properly denied Young's motion to suppress evidence of the marijuana.

to identify himself if the officer's inquiry is justified at its inception by reasonable suspicion and the inquiry is related to that suspicion. *See Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County,* 542 U.S. 177, 185–86 (2004).

¶ 78. Lastly, we conclude there was sufficient evidence to convict Young of resisting an officer, in violation of Wis. Stat. § 946.41(1). For Young to be guilty of resisting, the State had to prove: (1) Young resisted an officer, meaning he used force to oppose Alfredson; (2) Alfredson was acting in an official capacity; (3) Alfredson was acting with lawful authority; and (4) Young knew Alfredson was acting in his official capacity and with lawful authority and that his conduct would resist the officer. *See* Wis JI—Criminal 1765. As with his conviction for obstructing, Young only contests the third element; that is, whether Alfredson was acting with lawful authority. Because we have concluded that Alfredson had probable cause to arrest Young for obstruction before he physically apprehended Young, there is sufficient evidence in the record for a jury to have convicted Young of resisting.

## IV. CONCLUSION

¶ 79. Having considered the relative merits of the *Hodari D.* and *Mendenhall* tests, we conclude that the two tests can coexist and that the analysis supplied by *Hodari D.* applies when a suspect refuses to submit to a show of authority. Because Young fled in response to the police officer's show of authority, *Hodari D.* supplies the framework to analyze when Young was seized.

¶ 80. On the facts, we conclude the following: First, the Kenosha police officer had reasonable suspicion for an investigatory stop of the parked car in which Young was sitting. We need not decide whether the car and the occupants other than Young were seized. Second, when the officer ordered Young to return to the car after Young started to run away, the officer had reasonable suspicion to believe Young was committing a crime. Third, applying *Hodari D.*, Young was not seized within

the meaning of the Fourth Amendment until the officer physically detained him. Accordingly, the officer lawfully seized Young, and we affirm Young's convictions on all three counts.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 81. LOUIS B. BUTLER, JR., J. (*concurring in part, dissenting in part*). The majority, in affirming all three convictions of Charles Young (Young),[1] concludes the following: first, the Kenosha police officer had reasonable suspicion for an investigatory stop of the parked car that the defendant, Young, was sitting in; second, when the officer ordered Young to return to the car after Young started to run away, the officer had reasonable suspicion to believe Young was committing a crime; third, Young was not seized within the meaning of the Fourth Amendment until the officer physically detained him. Majority op., ¶¶ 5, 80. Because I agree that Young was not seized within the meaning of the Fourth Amendment until the officer physically detained him, I concur with and join Part III A of the majority opinion. I also join that portion of the mandate that affirms the judgments of conviction for each of the possession and resisting counts, albeit on different grounds. Because I conclude that the police initially lacked reasonable suspicion to stop Young in the first instance, I conclude that the evidence is insufficient to support the charge of obstructing an officer. Consequently, I would reverse the decision of the court of appeals with respect to that count.

¶ 82. The four elements of obstructing an officer pursuant to Wis. Stat. § 946.41(1), are as follows:

---

[1] Young was convicted of one count each for possession of marijuana, resisting an officer, and obstructing an officer.

1. The defendant obstructed an officer.

2. The officer was doing an act in an official capacity.

3. The officer was acting with lawful authority.

4. The defendant knew that *(officer)* was an officer acting in an official capacity and with lawful authority and that the defendant knew (his)(her) conduct would obstruct the officer.

Wis JI—Criminal 1766 (2003) (footnotes omitted). *See also State v. Grobstick,* 200 Wis. 2d 242, 248, 546 N.W.2d 187 (Ct. App. 1996) (citing § 946.41(1)).

¶ 83. There is no question that the officer was acting in an official capacity when he pulled alongside the vehicle and ordered Young to stop. For purposes of this analysis, I also accept that the term "obstructed" as used in the first element, means "hindered, delayed, impeded, frustrated or prevented an officer from performing his or her duties[.]" *State v. Hamilton,* 120 Wis. 2d 532, 541, 356 N.W.2d 169 (1984). *See also Grobstick,* 200 Wis. 2d at 249–50. At issue is whether the officer was acting with lawful authority at the time he initially ordered Young to stop, and whether Young knew that the officer was acting with lawful authority. *See State v. Lossman,* 118 Wis. 2d 526, 348 N.W.2d 159 (1984).

¶ 84. For the reasons stated in Justice Bradley's dissenting opinion,[2] I conclude that the officer lacked reasonable suspicion of the parked car in which Young was sitting. An investigatory stop is constitutional if the police have a reasonable suspicion that a crime has been, is being, or is about to be committed. Majority op., ¶ 20 (citing *State v. Waldner,* 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996)). "Reasonable suspicion requires that a police officer possess specific and articulable facts that

[2] Justice Bradley's dissent, ¶ 94 n.1.

warrant a reasonable belief that criminal activity is afoot. . . . A mere hunch that a person has been, is, or will be involved in criminal activity is insufficient." Majority op., ¶ 21 (*citing Waldner,* 206 Wis. 2d at 55; *Terry v. Ohio,* 392 U.S. 1, 27 (1968)).

¶ 85. Simply stated, five individuals sitting in a legally parked vehicle for nine minutes at night provides no specific or articulable facts that warrant a reasonable belief that criminal activity is afoot. The officer had no complaints linking the vehicle that Young was sitting in to any criminal activity. The individuals in the vehicle had done nothing suspicious to suggest that they were involved in criminal activity, unless, of course, sitting in a vehicle is considered inherently suspicious activity. No one in the car was observed drinking what appeared to be alcohol. No one in the car appeared to be engaged in drug transactions. No one in the car appeared to be arguing. The vehicle's radio was not being played at a loud volume. There was no evidence of littering around the vehicle.

¶ 86. The fact that the vehicle was unfamiliar to the officer adds nothing to the majority's analysis, as that would allow any officer to stop any vehicle that officer was unfamiliar with at any time, without regard to whether the person was acting suspicious. Moreover, while Wisconsin sports fans might view people from Illinois in a suspicious light, a person from Illinois being present in a Wisconsin border community provides no specific or articulable facts that criminal activity is taking place. No massaging of the facts here leads to a viable conclusion that reasonable suspicion existed prior to the stop.

¶ 87. The ramifications of the majority's analysis are downright frightening. If police can stop anyone they fail to recognize who is in a "problem area" without

any articulable showing that the person is doing something to suggest criminal activity, such a rationale could be used to support the wholesale interference of anyone who fails to fit the "community profile": a person who fails to match the racial profile of a community, a person who has out-of-state license plates, etc. Moreover, if this court were to allow such stops within the state, then other states might treat our citizens in the same manner. Would a car possessing Wisconsin license plates provide the basis for a lawful investigatory stop in Rockford, Illinois? What about Duluth, Minnesota? Would wearing a cheesehead provide a sufficient basis for a lawful stop in another state? Of course, such a result would be ridiculous and intolerable.

¶ 88. Based on the majority's analysis, the focus is no longer on the behavior of the accused, but would now rest solely on the character of the community. I am not aware of any decision that justifies the interference of one's liberty without considering that person's conduct. I would not adopt such a rule now. The officer in this case lacked reasonable suspicion that Young and the others who were with him were engaged in criminal activity prior to illuminating Young's vehicle with his spotlight and turning on his flashing emergency lights.

¶ 89. Justice Bradley correctly observes that when the police "do not possess reasonable suspicion to justify such a seizure, citizens have the right to go about their business and walk away." Justice Bradley's dissent, ¶ 97 (citing *Florida v. Royer,* 460 U.S. 491, 498 (1983)). The mere "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick,* 501 U.S. 429, 437 (1991). Young, therefore, had every right to go about his business and walk away, which, according to the majority opinion, is exactly

what he did. Majority op., ¶ 11. Young got out of the vehicle, which he had a right to do absent reasonable suspicion. When ordered to get back into the vehicle, he started to walk away, which he also had a right to do absent reasonable suspicion. It was after the officer ordered Young to return to the vehicle a second time that Young started running toward the house, subsequently resisted the officer, and finally slipped out of his coat (which contained marijuana).

¶ 90. This court has recognized that "[f]light at the sight of police is undeniably suspicious behavior." *State v. Anderson,* 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). Similarly, the United States Supreme Court has recognized that unprovoked flight is not a mere refusal to cooperate, but, by its very nature, is the opposite of "going about one's business[.]" *Illinois v. Wardlow,* 528 U.S. 119, 125 (2000). While both courts recognize that there are many innocent explanations for flight from police,[3] "flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true[.]" *Id.* As such, while flight "does not rise to a level of probable cause,"[4] it does provide the officer with "a reasonable suspicion that all is not well." *Anderson,* 155 Wis. 2d at 84. *See also Wardlow,* 528 U.S. at 125.

¶ 91. It is Young's flight, his physical resistance of the officer, coupled with this court's decision in *State v. Hobson,* 218 Wis. 2d 350, 380, 577 N.W.2d 825 (1998) (abrogating the previously recognized common law

---

[3] *State v. Anderson,* 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990); *Illinois v. Wardlow,* 528 U.S. 119, 125 (2000).

[4] *Anderson,* 155 Wis. 2d at 84. *See also Wardlow,* 528 U.S. at 125. The majority errs in concluding to the contrary, ignoring this controlling precedent. Majority op., ¶ 56.

46

privilege to forcibly resist an unlawful arrest),[5] that compel the conclusion that the officer was justified in arresting Young on the porch. It does not matter that the officer lacked a reasonable suspicion to initially stop Young. For public policy reasons,[6] he had no right to physically resist the officer, and in any case, Young's flight ultimately provided the officer with a reasonable suspicion that criminal activity was afoot. Similarly, Young's coat could be seized and searched incident to his arrest for resisting the officer on the porch.

¶ 92. The same cannot be said of the obstructing count. Prior to Young's flight, the officer lacked reasonable suspicion that would justify a *Terry*[7] stop. Thus, he was without lawful authority to order Young to get back in or return to the vehicle. Absent that lawful authority, the State has failed to establish the third element of the offense here, that being that the officer was acting with lawful authority prior to Young's flight. Thus, his flight cannot provide the basis for the obstructing charge. Further, the State has not and cannot establish that Young subjectively knew that the officer was acting with lawful authority. *See Lossman,* 118 Wis. 2d at 542–43. To conclude otherwise would relieve the State of its burden of proving each element beyond a reasonable doubt, and render the third and fourth elements meaningless. Consequently, I would reverse the court of appeals decision with respect to the obstructing count, as the evidence is insufficient to support that charge.

---

[5] I do not mean to suggest that this decision relieves the State of its burden to establish the element of lawful authority. *Compare e.g.* Wis JI—Criminal 795 and 1765 (2003). Young has not challenged the sufficiency of evidence of the resisting count.

[6] *State v. Hobson,* 218 Wis. 2d 350, 371–80, 577 N.W.2d 825 (1998).

[7] *Terry v. Ohio,* 392 U.S. 1 (1968).

¶ 93. For the forgoing reasons, I concur with the mandate affirming Young's convictions for possession of marijuana and for resisting an officer, but I respectfully dissent from the decision and mandate affirming Young's conviction for obstructing an officer.

¶ 94. ANN WALSH BRADLEY, J. (*dissenting*). Although I disagree with the majority opinion in several respects I write to focus on its unfortunate, perhaps even needless, adherence to the test for a seizure under the now-infamous case of *California v. Hodari D.*, 499 U.S. 621 (1991).[1] As a consequence of this test, the right that Wisconsin citizens once possessed to go about their business and "walk away" from police during the course of a casual encounter may no longer exist.

¶ 95. In applying *Hodari D.*, the majority:

(I) embraces a case that has been widely criticized and oft rejected for good reason;

(II) ignores the test for a seizure as stated in the recent United States Supreme Court decision of *Kaupp v. Texas*, 538 U.S. 626 (2003); and

(III) assumes that this court previously adopted *Hodari D.* even though that is less than clear.

---

[1] I disagree with the majority that the investigating officer had reasonable suspicion for a stop of the parked car in which Young was sitting. *See* majority op., ¶¶ 5, 58–64. Police do not possess reasonable suspicion simply because individuals remain in a parked vehicle at night for approximately 10 minutes in a "problem area." It adds nothing to the reasonable suspicion analysis here that the vehicle was also "unfamiliar" to the investigating officer and had Illinois license plates. The stop took place in Kenosha, a populous area that borders Illinois. The court of appeals was right to "harbor doubt" as to whether the officer had reasonable suspicion to stop the parked car. *State v. Young*, 2004 WI App 227, ¶ 10 n.4, 277 Wis. 2d 715, 690 N.W.2d 866.

¶ 96. I would decline to apply *Hodari D.* Instead, I would continue to follow the test the Court set forth in *United States v. Mendenhall,* 446 U.S. 544 (1980), and recently reaffirmed in *Kaupp* in order to determine whether a citizen has been seized.

¶ 97. Under this test the existence of a seizure does not depend on whether the citizen submitted to a police show of authority, absent physical force. Rather, a citizen is seized when, taking into account all of the circumstances involved in an encounter with police, a reasonable person would not feel free to leave. *Kaupp,* 538 U.S. at 629; *Mendenhall,* 446 U.S. at 554. In the case of a temporary seizure (a *Terry* stop), as is implicated here, when police do not possess reasonable suspicion to justify such a seizure, citizens have the right to go about their business and walk away. *Florida v. Royer,* 460 U.S. 491, 498 (1983).[2]

¶ 98. Ultimately, I am convinced that the distinctions the majority draws between what constitutes the legitimate exercise of the right to walk away and what constitutes illegitimate flight will often amount to a line drawn in the sand on a windy day. For all of these reasons, I respectfully dissent.

I

¶ 99. Commentators and courts alike have criticized *Hodari D.* Many courts have rejected it. This is for good reason.

---

[2] This court and the court of appeals have followed this test in cases after *California v. Hodari D.,* 499 U.S. 621 (1991). *See, e.g., State v. Williams,* 2002 WI 94, ¶¶ 20–23, 255 Wis. 2d 1, 646 N.W.2d 834; *State v. Jones,* 2005 WI App 26, ¶¶ 9–21, 278 Wis. 2d 774, 693 N.W.2d 104, *review denied,* 2005 WI 134, 282 Wis. 2d 720, 700 N.W.2d 272.

¶ 100. Professor LaFave, in his leading treatise on the law of search and seizure, devotes approximately 13 pages to the matter, impressively synthesizing a large body of Fourth Amendment case law. Wayne R. LaFave, 4 *Search and Seizure* § 9.4(d), at 453–66 (4th ed. 2004).

¶ 101. Numerous other commentators have approached *Hodari D.* with similar skepticism. Juan F. Alanis, *To Seize or not to Seize . . .* , 23 Am. J. Crim. L. 461, 474–478 (1996); Ronald J. Bacigal, *The Right of the People to Be Secure,* 82 Ky. L.J. 145, 146, 179–188 (1993); Thomas K. Clancy, *The Future of Fourth Amendment Seizure Analysis after Hodari D. and Bostick,* 28 Am. Crim. L. Rev. 799, 841–842 (1991); Patrick T. Costello, *California v. Hodari D.: The Demise of the Reasonable Person Test in Fourth Amendment Analysis,* 12 N. Ill. U. L. Rev. 463, 483–84 (1992); Michelle R. Ghetti, *Seizure Through the Looking Glass: Constitutional Analyses in Alice's Wonderland,* 22 S.U. L. Rev. 231, 243 (1995); Randolph Alexander Piedrahita, *A Conservative Court says "Goodbye to All That" and Forges a New Order in the Law of Seizure—California v. Hodari D.,* 52 La. L. Rev. 1321, 1333 (1992); Victor R. Quiros, *The Impact of California v. Hodari D. Upon Police Pursuits in California: The Fruit of the Poisonous Tree is No Longer Poisonous,* 19 W. St. U. L. Rev. 641, 661–62 (1992); Alyssa Saks, *Can Attempted Seizures be Unreasonable?: Applying the Law of Attempt to the Fourth Amendment,* 37 Cal. W. L. Rev. 427, 429–430, 438 (2001); Richard W. Zahn, *California v. Hodari D.: An Evolving Definition of Seizure Under the Fourth Amendment,* 27 New Eng. L. Rev. 447, 466 (1992); *Defining a Seizure—Police Chases and Bus Sweeps: Florida v. Bostick and California v. Hodari D.,* 105 Harv. L. Rev. 297, 298–299 (1991).

¶ 102. I highlight some of the most compelling criticisms as summarized by Professor LaFave.[3]

¶ 103. **Criticism 1.** Contrary to the *Hodari D.* hypothesis, pursuit constitutes an immediate infringement on the suspect's freedom of movement. This is because the person being pursued reasonably knows that the object of the chase is capture; that the police purpose is to restrain his liberty; that if he stopped running, he would not be free to leave; and that in effecting the capture police will resort to physical force if necessary. 4 *Search and Seizure* § 9.4(d), at 459–60.

¶ 104. **Criticism 2.** Under *Hodari D.,* the timing of a seizure is governed not by the officer's conduct but by the citizen's reaction, a result inconsistent with other established Fourth Amendment jurisprudence. The Court in *Michigan v. Chesternut,* 486 U.S. 567, 574 (1988), for example, emphasized the necessity of a standard that "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment."

¶ 105. **Criticism 3.** When applying *Hodari D.,* courts will frequently be confronted with difficult questions concerning precisely when the requisite physical force or submission to authority commenced. 4 *Search and Seizure* § 9.4(d), at 462. As Justice Stevens put it in his dissent to *Hodari D.:* "The range of possible responses to a police show of force, and the multitude of problems that may arise in determining whether, and at which moment, there has been 'submission,' can only create uncertainty and generate litigation." *Hodari D.,* 499 U.S. at 644 (Stevens, J., dissenting).

---

[3] As the majority states, many of the criticisms of *Hodari D.* amplify the points made by the dissent in *Hodari D. See* majority op., ¶ 43.

51

¶ 106. Some cases may involve rather obvious flight. However, it may be difficult for courts in future cases to distinguish between what constitutes the legitimate exercise of the right to walk away and what constitutes illegitimate flight.

¶ 107. **Criticism 4.** Under *Hodari D.*, it will be advantageous to police officers to place the seizure at the latest possible moment so as to be able to use any earlier-revealed evidence as part of the basis for a *Terry* stop. 4 *Search and Seizure* § 9.4(d), at 462. Such an approach diminishes the established constitutional protections against unreasonable seizures.

¶ 108. No fewer than 11 other courts of last resort have rejected *Hodari D. State v. Oquendo,* 613 A.2d 1300, 1309 (Conn. 1992); *Jones v. State,* 745 A.2d 856, 863–68 (Del. 1999); *State v. Quino,* 840 P.2d 358, 362 (Haw. 1992); *Baker v. Commonwealth,* 5 S.W.3d 142, 145 (Ky. 1999); *Commonwealth v. Stoute,* 665 N.E.2d 93, 97–98 (Mass. 1996); *Matter of E.D.J.,* 502 N.W.2d 779, 780–83 (Minn. 1993); *State v. Clayton,* 45 P.3d 30, 34 (Mont. 2002); *State v. Tucker,* 642 A.2d 401, 405 (N.J. 1994); *Commonwealth v. Matos,* 672 A.2d 769, 771–76 (Pa. 1996); *State v. Randolph,* 74 S.W.3d 330, 331–37 (Tenn. 2002); *State v. Young,* 957 P.2d 681, 687 (Wash. 1998); *see also People v. Holmes,* 619 N.E.2d 396, 397–98 (N.Y. 1993) (without citing *Hodari D.,* holding that police pursuit of an individual significantly impedes the person's freedom of movement and thus must be justified by reasonable suspicion).

¶ 109. The widespread criticism and rejection of *Hodari D.* is well founded. *Hodari D.* states that, absent physical force, a seizure does not occur unless the citizen under investigation yields to the police show of authority. *Hodari D.,* 499 U.S. at 626. This statement is

difficult to reconcile with the Court's other established Fourth Amendment jurisprudence.

¶ 110. For example, I cannot reconcile *Hodari D.*'s statement with *Terry,* which held:

> [C]ourts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

*Terry v. Ohio,* 392 U.S. 1, 15 (1968).

¶ 111. Similarly, I cannot reconcile *Hodari D.*'s statement with *Chesternut.* In *Chesternut,* the Court held: "[The test for a seizure] calls for consistent application from one police encounter to the next, *regardless of the particular individual's response to the actions of the police." Chesternut,* 486 U.S. at 574 (emphasis added).

¶ 112. Moreover, the Court's decision in *Mendenhall* strongly suggests that its test contemplated that suspects may often attempt to flee or otherwise evade police but that this did not forestall the seizure. In *Mendenhall,* the Court gave "[e]xamples of circumstances that might indicate a seizure, *even where* the person did *not* attempt to leave." *Mendenhall,* 446 U.S. at 554 (emphasis added). The Court's use of "even where" evinces its assumption that in the course of a typical seizure the suspect often *would* attempt to leave.

¶ 113. The examples the Court gave of what might "indicate a seizure" include "the threatening presence of several officers, the display of a weapon by

an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* These examples of what might "indicate a seizure" further suggest that the test for a seizure does not encompass a citizen's response to the police officers' conduct.

¶ 114. Yet, in *Hodari D.*, the Court did not say it was overruling any of this previous jurisprudence. On the contrary, it purported to rely on at least some of it. *Hodari D.*, 499 U.S. at 627–28.

¶ 115. I am persuaded by the commentators and courts that have rightly criticized and rejected *Hodari D.*

¶ 116. So was the court of appeals. In the case before us, it expressed serious reservations about the problems with *Hodari D.* "[W]e are less than enthusiastic," the court flatly stated, "about the result that *Hodari D.* mandates in this case." *State v. Young,* 2004 WI App 227, ¶ 19, 277 Wis. 2d 715, 690 N.W.2d 866. The court then explained its concern that *Hodari D.* may eviscerate the right to walk away:

> [A]fter *Hodari D.,* [Young's] supposed right to "go on his way" becomes an empty right because it vests police with the authority to pursue and detain anew. In short, the person is penalized for legal conduct while police are rewarded for illegal conduct.

*Id.,* ¶ 20.

¶ 117. The court of appeals was correct. The right to go about one's business and "walk away" cannot coexist with a rule that, absent physical force, no seizure may attach before a citizen submits to the police show of authority.

¶ 118. Even the majority feels it necessary to "recognize the strength" of some of the criticisms described. Majority op., ¶ 47. Unfortunately, the majority embraces *Hodari D.* anyway.

## II

¶ 119. Adding to my concern with the majority's embrace of *Hodari D.* is that the United States Supreme Court's recent decision in *Kaupp* leaves uncertain the present status of *Hodari D.*

¶ 120. In *Kaupp,* the Court unequivocally reaffirmed what I always understood to be the *Mendenhall* test:

> A seizure of the person within the meaning of the Fourth and Fourteenth Amendments *occurs when* . . . the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.

*Kaupp,* 538 U.S. at 629 (emphasis added; internal quotations omitted).

¶ 121. In *Kaupp* the Court did not say that a seizure "may occur when" or "can occur when" or "occurs 'only' when." In other words, the Court in *Kaupp* was clear that "*when*" police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business, that *is* a sufficient condition to effect a seizure.[4]

---

[4] The full text of the relevant portion of *Kaupp v. Texas,* 538 U.S. 626 (2003), reads as follows:

A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not

¶ 122. Unlike the straightforward reading of *Mendenhall* that the Court in *Kaupp* reaffirmed, the Court in *Hodari D.* sliced and diced and nuanced the text of *Mendenhall*. *See Hodari D.*, 499 U.S. at 628 ("*[Mendenhall]* says that a person has been seized 'only if' [a reasonable person would have believed that he was not free to leave], not that he has been seized 'whenever'; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.' ") (emphasis in original).[5]

¶ 123. Thus, the interpretative gloss the Court placed on *Mendenhall* in *Hodari D.* does not square with its subsequent reaffirmation of the *Mendenhall* test in *Kaupp*.

---

at liberty to ignore the police presence and go about his business.' " *Florida v. Bostick,* 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569 (1988)). This test is derived from Justice Stewart's opinion in *United States v. Mendenhall,* 446 U.S. 544 (1980), *see California v. Hodari D.,* 499 U.S. 621, 627–628 (1991), which gave several "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave," including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall, supra,* at 554.

*Kaupp,* 538 U.S. at 629–30.

[5] In *Kaupp,* the Court also recounted how in *United States v. Mendenhall,* 446 U.S. 544 (1980), it "gave several [e]xamples of circumstances that might indicate a seizure, *even where* the person did *not* attempt to leave, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Kaupp,* 538 U.S. at 630 (emphasis added; internal quotations omitted).

¶ 124. The majority does not account for the test in *Kaupp*. Unlike the majority, I would give credence to the most recent pronouncement of the Court. Following *Kaupp*, I would ask "when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp*, 538 U.S. at 629 (internal quotations omitted).[6]

### III

¶ 125. What is additionally unfortunate about the majority's embrace of *Hodari D.* today is that it may have been needless. The majority assumes that "[i]n *State v. Kelsey C.R.*, 2001 WI 54, ¶ 33, 243 Wis. 2d 422, 626 N.W.2d 777, this court adopted the *Hodari D.* test for 'when a seizure occurs'" Majority op., ¶ 4; *see also* majority op., ¶¶ 26, 51. It is less than clear, however, whether this court adopted *Hodari D.* in *Kelsey C.R.* In order to see why, I begin by delving deeper into *Kelsey C.R.*

¶ 126. The language in *Kelsey C.R.* "adopting" *Hodari D.* comes from the "majority" opinion of three justices. Two justices concurred. *Kelsey C.R.*, 243 Wis. 2d 422, ¶¶ 52, 72. Two justices dissented. *Id.*, ¶¶ 73, 98.

¶ 127. The defendant in *Kelsey C.R.* was a juvenile girl, who police officers suspected might be a runaway. *Id.*, ¶¶ 4–5. They found her sitting in the

---

[6] The majority states that I "ignore[] the fact that a court does not reach the *Hodari D.* test until a defendant refuses to submit to a police show of authority." Majority op., ¶ 40 n.13. This "fact" is nothing but the majority's own attempt to explain how the test for a seizure as stated in *Hodari D.* can somehow be squared with the test as stated in other United States Supreme Court cases, including *Kaupp*.

middle of a block in a high-crime neighborhood in Milwaukee. *Id.,* ¶ 4. From their car, the officers asked her some questions, remained concerned based on her answers, and told her to "stay put" so they could make a U-turn to be on the same side of the street as Kelsey to ask her more questions. *Id.,* ¶ 5. At that point, she fled. *Id.*

¶ 128. After a 30– to 40–second chase, the officers caught Kelsey. They contacted her mother, who asked that they bring Kelsey home. *Id.,* ¶ 6. Before the officers placed her in their car, they conducted a pat-down search and found a loaded handgun. *Id.,* ¶ 7.[7]

¶ 129. The three-justice opinion in *Kelsey C.R.* stated three issues:

> One, did the police officers seize Kelsey, thereby invok-ing her constitutional protection against unreasonable seizures, when [one of the officers] told her to "stay put" but she ran away? Two, was the investigative detention after she fled based on a reasonable suspicion that she had committed, was committing, or was about to com-mit, a crime? Three, was the pat-down search of Kelsey based on a reasonable suspicion that she may be armed and dangerous?

*Id.,* ¶ 11.

¶ 130. In addressing the first issue, three justices clearly applied *Hodari D.* to determine that there was no seizure of Kelsey until the officers applied physical force by catching her after a chase. *Id.,* ¶ 33. Those justices did not, however, stop with *Hodari D.* They also addressed the first issue using a community caretaker analysis, concluding that "if this initial exchange was a

---

[7] The male officers waited 20 minutes for a female officer to arrive and conduct the pat-down. *State v. Kelsey C.R.,* 2001 WI 54, ¶ 7, 243 Wis. 2d 422, 626 N.W.2d 777.

seizure, then it was reasonable under the police community caretaker function." *Id.,* ¶ 37. They then addressed the second issue, another *Terry* stop question, and the third issue, which involved the pat-down. *Id.,* ¶¶ 38, 47.

¶ 131. Without mention of *Hodari D.,* the concurring opinion in *Kelsey C.R.* stated that it agreed with "the majority's two-part analysis of the stop in this case." *Id.,* ¶ 52 (Sykes, J., concurring). It is less than clear what the concurrence was referencing because there were two asserted "stops" in the case, and the "majority" concluded that only the second was a seizure. Like the concurrence, the dissent made no mention of *Hodari D.*

¶ 132. The lack of clarity as to whether a majority of justices took a position on *Hodari D.* in *Kelsey C.R.* is underscored by an examination of the court of appeals' decisions that have subsequently interpreted *Kelsey C.R.*

¶ 133. In *State v. Hart,* 2001 WI App 283, 249 Wis. 2d 329, 639 N.W.2d 213,[8] the court of appeals interpreted *Kelsey C.R.* as follows: "*Apparently, all* of the justices agreed that the officers did not seize Kelsey by telling her to 'stay put.' " *Hart,* 249 Wis. 2d 329, ¶ 16 (emphasis added). In a footnote, the court of appeals elaborated:

> The *plurality* relied on *California v. Hodari D.,* 499 U.S. 621, 626 (1991), to hold that in order to effect a seizure, an officer must make a show of authority, and the citizen must actually yield to that show of authority. *State v. Kelsey C.R.,* 2001 WI 54, ¶ 33, 243 Wis. 2d 422,

---

[8] This court overruled *State v. Hart,* 2001 WI App 283, 249 Wis. 2d 329, 639 N.W.2d 213, in part on other grounds in *State v. Sykes,* 2005 WI 48, ¶ 33, 279 Wis. 2d 742, 695 N.W.2d 277.

626 N.W.2d 777. Because Kelsey did not yield to the officer when he told her to "stay put," no seizure occurred until the officers caught her after she fled. *Id. Neither the concurring or dissenting opinions disagreed* with this portion of the plurality's decision.

*Hart,* 249 Wis. 2d 329, ¶ 16 n.6 (emphasis added). Thus, the court of appeals concluded that all of the justices "[a]pparently" agreed that *Hodari D.* applied because a "plurality" relied on *Hodari D.* and because neither the concurring nor dissenting opinions expressly "disagreed" that it applied.

¶ 134. In a later case, *State v. Powers,* 2004 WI App 143, 275 Wis. 2d 456, 685 N.W.2d 869, the court of appeals was not so equivocal. There, it interpreted *Kelsey C.R.* differently. It unequivocally stated that in *Kelsey C.R.* "the supreme court held, 'In order to effect a seizure, an officer must make a show of authority, and the citizen must actually yield to that show of authority.' " *Powers,* 275 Wis. 2d 456, ¶ 8 (quoting *Kelsey C.R.,* 243 Wis. 2d 422, ¶ 33).

¶ 135. Then, in *State v. Washington,* 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305, the court of appeals seemed to give *Kelsey C.R.* yet a third interpretation, again taking a slightly different view of the case. It first said that "[o]ur supreme court has indicated that it 'will follow the *Hodari D.* standard for when a seizure occurs.' " *Washington,* 284 Wis. 2d 456, ¶ 13 n.4. However, it qualified: "While *Kelsey C.R.* was a case concerning . . . the community caretaker function, this court [the court of appeals] has also employed the *Hodari D.* standard in a *Terry* stop case." *Id.,* ¶ 13 n.4. The case to which the court of appeals was referring was its decision in the case now before us.

¶ 136. Whether more than three justices in *Kelsey C.R.* adopted *Hodari D.* is less than clear from the

*Kelsey C.R.* decision. The court of appeals has interpreted *Kelsey C.R.* at least three times, each time in a slightly different way. For me, this underscores the lack of clarity as to whether a majority of this court even adopted *Hodari D.* in *Kelsey C.R.* Yet today, the majority simply assumes that *Hodari·D.* is settled law in Wisconsin. It laments the strength of the criticisms of *Hodari D.,* while professing to be bridled by its own recent precedent. *See* majority op., ¶¶ 43, 51.

## IV

¶ 137. For the reasons stated, I would decline to apply *Hodari D.* Instead, I would continue to follow the test the Court set forth in *Mendenhall* and recently reaffirmed in *Kaupp* in order to determine the moment that a citizen is seized. Under that test the existence of a seizure does not depend on whether the citizen submitted to a police show of authority. I therefore respectfully dissent.

¶ 138. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.