STATE of Wisconsin, Plaintiff-Appellant,†

v.

Reginald R. JONES, Defendant-Respondent.
[Case No. 03-3216-CR.]

STATE of Wisconsin, Plaintiff-Appellant,†

v.

Maurice E. O'NEAL, Defendant-Respondent.
[Case No. 03-3217-CR.]

Court of Appeals

*Nos. 03–3216–CR, 03–3217–CR. Submitted on briefs
November 23, 2004.—Decided January 26, 2005.*

2005 WI App 26

(Also reported in 693 N.W.2d 104.)

† Petition to review denied 6-1-2005.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Peggy A. Lautenschlager*, attorney general, and *Sarah K. Larson*, assistant attorney general.

On behalf of the defendant-respondent, Reginald R. Jones, the cause was submitted on the brief of *John P. Tedesco*, assistant state public defender.

On behalf of the defendant,Maurice E. O'Neal, the cause was submitted on the brief of *Attorney Jess Martinez*, of Waukesha.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

¶ 1. NETTESHEIM, J. The State of Wisconsin appeals from an order suppressing evidence obtained during a consent search of an automobile driven by Maurice E. O'Neal. The evidence recovered resulted in charges against O'Neal and the passenger in his vehicle, Reginald R. Jones.[1] The issue in this case is whether O'Neal was seized within the meaning of the Fourth Amendment when he consented to the search. We conclude that he was and therefore his consent was invalid. We affirm the trial court order.

## *Background*

¶ 2. The facts underlying the issue on appeal are not disputed. On April 9, 2003, at 1:49 a.m., Sheboygan County Sheriff's Deputy Brent Multer obtained a radar reading of a vehicle traveling in excess of the posted speed limit on Highway I-43 in Sheboygan county. Multer pursued and stopped the vehicle. Multer advised the driver that he had been stopped for speeding, and he asked both the driver and the passenger for identification, which identified O'Neal as the driver and Jones as the passenger.[2] Multer then asked where they were going. Jones responded that they were headed to Green Bay to visit his girlfriend. Multer asked how long they were planning to stay there and Jones first responded that they were going for a few days but later indicated that they were going for between a week and two weeks. Multer's initial exchange with O'Neal and Jones lasted approximately three to four minutes.

---

[1] On December 22, 2003, this court granted the State's motion to consolidate the appeals.

[2] There were two young children, ages nine months and eighteen months, asleep in the backseat of the vehicle.

¶ 3. Multer returned to his vehicle to run checks on the identifications provided by O'Neal and Jones and the vehicle license plate. The checks did not reveal anything irregular or suspicious. Multer then wrote out a warning citation for O'Neal, but also called for backup assistance. Multer then returned to the O'Neal vehicle and requested O'Neal to accompany him to the rear of the vehicle. O'Neal complied, and Multer explained the warning citation to him. At this point, Deputy Brad Abel arrived as backup; however, he did not say anything to either Jones or O'Neal. Multer then returned both identification cards to O'Neal. Jones remained seated in the car during this exchange.

¶ 4. Once he had returned the identification cards, Multer asked O'Neal if he had any further questions regarding the citation and O'Neal indicated that he did not. Less than a few seconds later, Multer asked O'Neal whether there was anything illegal in the vehicle. O'Neal responded that there was nothing illegal in the vehicle, whereupon Multer asked if O'Neal would mind if he searched the vehicle. This process is known as a "Badger"—a police interdiction technique by which the officer attempts to obtain the person's consent to a search even though the officer has no legal basis to further detain the person. *See State v. Williams*, 2002 WI 94, ¶¶ 7, 43, 255 Wis. 2d 1, 646 N.W.2d 834. In response to Multer's request to search the vehicle, O'Neal responded, "No, go ahead." The search uncovered a semiautomatic handgun under the front passenger seat and cocaine under the hood of the vehicle. O'Neal and Jones were placed under arrest.

¶ 5. The State charged both Jones and O'Neal with possession with intent to deliver cocaine as a party to the crime pursuant to Wis. Stat. §§ 961.41(1m)(cm)4.

and 939.05 (2003–04).[3] In addition, the State charged Jones with carrying a concealed weapon pursuant to Wis. Stat. § 941.23, and charged O'Neal with knowingly keeping a vehicle for controlled substances use pursuant to Wis. Stat. § 961.42(1). These charges were repeated in the informations filed against O'Neal and Jones following their bindover at preliminary hearing.

¶ 6. O'Neal and Jones then moved for the suppression of the evidence found in the vehicle. Relying on the supreme court's decision in *Williams*, both O'Neal and Jones argued that O'Neal's consent to the search of his vehicle was invalid. Following a hearing and a consideration of the parties' briefs, the trial court issued a bench decision granting the motions to suppress. The court determined that under the totality of the circumstances, and particularly Multer's request that O'Neal step out of the vehicle and the contemporaneous arrival of the backup deputy, a reasonable person in O'Neal's position would not have felt free to leave once the traffic matter had been completed. Instead, the court concluded that a reasonable person would have felt compelled to remain and respond to Multer's follow-up request to search his vehicle. The State appeals.

### *Discussion*

¶ 7. At the outset, we clarify the issue in this case. Neither O'Neal nor Jones challenges the legality of the initial stop of the vehicle. In addition, the trial court found, and neither party disputes, that the traffic stop had concluded prior to Multer's request to search

---

[3] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

O'Neal's vehicle.[4] Therefore, the issue is narrowed to whether O'Neal was "seized" for purposes of the Fourth

[4] We are satisfied that Multer's issuance of the warning citation to O'Neal and Multer's return of O'Neal's and Jones' identification cards support the parties' and the trial court's conclusion that the traffic stop had ended prior to O'Neal's consent. In *State v. Williams*, 2002 WI 94, ¶ 26, 255 Wis. 2d 1, 646 N.W.2d 834, the court determined:

> It is quite clear based upon the established evidentiary facts in this case that the traffic stop had concluded before [Officer] Fetherston questioned Williams about contraband in the car and asked for permission to search. Fetherston told Williams he would be free to go after he signed the warning citation; Williams did so, and the citation was handed to him. Fetherston had already returned Williams' driver's license and rental papers. Fetherston said, unequivocally, "[w]e'll let you get on your way then okay." Fetherston and Williams shook hands and exchanged common parting pleasantries ("have a good day" and "take care, we'll see you"), and turned away from each other, at least momentarily.

Although the determination in *Williams* suggests that a handshake or parting statements are factors to be considered in whether a traffic stop has concluded, there is case law holding that a traffic stop is concluded when the driver has received his or her citation and driver's license. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) ("A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."). Therefore, this case does not involve a question of whether Multer impermissibly exceeded the scope of an ongoing traffic stop. *See State v. Gaulrapp*, 207 Wis. 2d 600, 558 N.W.2d 696 (Ct. App. 1996) (officer had not issued citation at the time request to search was made). While the State's assertion that this is a *Williams* case relies on the trial court's determination that the traffic stop had concluded, the analysis employed in *Williams* is not so simplistic. Rather, the analysis focuses on how a reasonable person would react under the totality of the circumstances. *Williams*, 255 Wis. 2d 1, ¶ 4.

Amendment when he consented to the search of the vehicle.

¶ 8. "When a Fourth Amendment challenge is raised at the trial court level, the trial court considers the evidence, makes findings of evidentiary or historical fact, and then resolves the issue by applying constitutional principles to those historical facts." *State v. Griffith*, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. "On review, this court gives deference to the trial court's findings of evidentiary or historical fact, but determines the question of constitutional fact independently." *Id.* Thus, whether O'Neal was illegally seized at the time he gave his consent presents a question of constitutional fact which we review de novo. *See Williams*, 255 Wis. 2d 1, ¶ 17.

¶ 9. Warrantless searches are per se unreasonable under the Fourth Amendment. *Id.*, ¶ 18. However, a search authorized by consent is wholly valid unless that

Also on this matter, we note that although Jones and O'Neal agree with the trial court's determination that the traffic stop had concluded and a second seizure occurred, their arguments differ. Jones contends that the transition from traffic stop to consensual encounter was so "seamless" that it would be imperceptible to a reasonable person and as such, a reasonable person would not have felt free to leave the scene. O'Neal argues that the traffic stop had completed and the officer then lacked reasonable suspicion to seize O'Neal. However, O'Neal overlooks that the State does not argue that reasonable suspicion justified Multer's actions. Rather, the State contends that the traffic stop had concluded and that, pursuant to *Williams*, a reasonable person in O'Neal's situation would have believed he or she was free to leave the scene. We therefore analyze this case under the approach taken by Jones and the State.

consent is given while an individual is illegally seized. *See id.*, ¶¶ 19–20. O'Neal and Jones contend that O'Neal was illegally seized at the time he gave his consent. Whether O'Neal was in fact seized for purposes of the Fourth Amendment requires the application of an objective test as to whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Id.*, ¶ 4 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The general rule is that a seizure has occurred when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . .' " *Williams*, 255 Wis. 2d 1, ¶ 20 (citing *Mendenhall*, 446 U.S. at 552).

¶ 10. The *Mendenhall* test adopted by the Supreme Court is as follows:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554–55 (citations and footnote omitted).

¶ 11. The supreme court applied the reasonable person test in *Williams*. There, Williams was stopped

for speeding on I-94. *Williams*, 255 Wis. 2d 1, ¶ 2. The state trooper conducting the stop employed a "Badger." (*See supra* at ¶ 4). The trooper called for backup assistance, issued a warning citation, returned Williams' driver's license and other paperwork, said "[we]'ll let you get on your way then," shook hands, and headed back to his squad car. *Williams*, 255 Wis. 2d 1, ¶¶ 7–12. After a step or two, the trooper abruptly turned around and began questioning Williams about whether he had any guns, knives, drugs, or large amounts of money in the car, and asked for permission to search. *Id.*, ¶ 12. Williams denied having any of the items in question and gave consent to search. *Id.*

¶ 12. Noting that "questioning alone does not a seizure make, and the fact that this defendant . . . spontaneously and voluntarily responded to the officer's questions is not enough to transform an otherwise consensual exchange into an illegal seizure," the court concluded that a reasonable person in Williams' position would have felt free to decline to answer the officer's questions and simply "get on [his] way." *Id.*, ¶ 28 (citation omitted).

¶ 13. In so holding, the *Williams* court stated that the fact that the officer "had just invited Williams to 'get on [his] way' strongly influences our conclusion." *Id.*, ¶ 29.

> The officer's words and actions, considered as a whole, communicated permission to leave, as the traffic stop was over. The officer did nothing, verbally or physically, to compel Williams to stay. That Williams stayed, and answered the questions, and gave consent to search, is not constitutionally suspect, and does not give rise to an inference that he must have been compelled to do so.

*Id.*

¶ 14. The *Williams* court rejected the court of appeals' conclusion that the tone, tenor and rapidity of the officer's questions; the presence and stance of the backup officer, whose squad lights were still flashing; the location; and the time of night combined to constitute a seizure. *Id.*, ¶ 30. Instead, the *Williams* court concluded that the change in tone and tenor of the officer's voice was not so significant that the officer's questions took on the character of an official command compelling compliance. *Id.*, ¶ 31. The court also concluded that the presence and behavior of the backup officer, who did not display a weapon or physically touch Williams, was not so intimidating as to convert the exchange into a seizure. *Id.*, ¶ 32. Finally, the court determined that the presence of emergency lights was not significant and neither the time (2:30 a.m.) nor the location (a rural stretch of highway) contributed to a coercive atmosphere. *Id.*, ¶¶ 33–34.

¶ 15. This case has obvious similarities to *Williams*. In both cases, the defendants were stopped for routine traffic violations, both officers employed a "Badger" technique, and both drivers complied with the officer's request to step out of the vehicle and move to the rear bumper area where the officer issued a warning citation. *See id.*, ¶ 9. In addition, two squad cars, at least one with emergency lights activated, and a backup deputy were present in each case. *See id.*, ¶ 8.

¶ 16. However, the cases differ in one important aspect—a difference correctly noted by the trial court in this case. In *Williams*, the officer told Williams, "This is a warning for speeding, need a signature and we'll get you on your way then." *Id.*, ¶ 9. The officer handed the citation to Williams and asked if he had any questions, to which Williams responded that he did not. *Id.*, ¶ 11.

The officer then stated, "Good, we'll let you get on your way then okay." *Id*. Williams and the officer shook hands and both took a step or two back to their vehicles before the officer asked Williams if he had any illegal items in his vehicle. *Id*., ¶ 12. While in this case, Multer handed O'Neal the warning and returned the identifications, Multer never advised O'Neal that he was free to leave. Nor did Multer engage in any physical exchange with O'Neal, such as a handshake or other gesture, conveying the idea that O'Neal was free to leave.

¶ 17. As noted above, the officer's invitation to Williams to "get on [his] way" strongly influenced the supreme court's conclusion. *Id*., ¶ 29. While we agree with the State that the supreme court did not establish a bright-line rule that an officer must say "have a nice day" or shake hands with an individual in order for an ensuing encounter to be consensual, it is clear that the court saw those facts as sufficient to tip the scale in favor of a finding that the subsequent encounter was consensual. We therefore read *Williams* to require some verbal or physical demonstration by the officer, or some other equivalent facts, which clearly convey to the person that the traffic matter is concluded and that the person should be on his or her way. Absent that, it is a legal fiction to conclude that a reasonable person would deduce, infer or believe that he or she is free to depart the scene.

¶ 18. In this case, Multer started down this path, but he did not complete the journey. Multer's issuance of the warning citation and the return of the identifications suggested finality to the matter, but within a few seconds thereafter, Multer put an accusatory question to O'Neal, inquiring whether anything illegal was in the vehicle, followed by his request to search the vehicle. Thus, there was no significant demarcation

785

between the conclusion of the traffic matter and Multer's attempt to obtain O'Neal's consent to a search of the vehicle. Instead, the two matters were seamlessly woven together, which, as demonstrated in *Williams*, is the very purpose of the "Badger" technique.[5]

¶ 19. Here, the trial court determined that a reasonable person in O'Neal's position would have felt compelled to stay and answer Multer's questions.[6] The

---

[5] We note that the State mischaracterizes the trial court ruling as finding that the officer's statement in *Williams* that Williams could "get on his way" was dispositive. However, a review of the trial court's decision indicates that the trial court considered "all of the circumstances" before noting in the language cited by the State that "[t]his is the *Williams* case with an important factual distinction. In *Williams* the Supreme Court was strongly influenced by invitation of the officer to Williams to get on his way. No similar communication was given to O'Neal. The consent was invalid. The search was nonconsensual." That the trial court considered the absence of such a statement to be significant in its consideration of the totality of the circumstances is not surprising in light of the supreme court's statement in *Williams* that the officer's statement "strongly influence[d]" its decision. *See Williams*, 255 Wis. 2d 1, ¶ 29.

[6] The State argues that the trial court impermissibly focused on O'Neal's subjective belief as to whether he was free to leave. The State cites to the trial court's statement that, "Mr. O'Neal didn't know under the totality of the circumstances that he could decline and leave the scene." However, immediately following this statement, the trial court states the proper objective inquiry, "The reasonable person would have felt compelled to stay and answer." The trial court later repeated the correct inquiry, stating, "Here's the issue: Would a reasonable person in this circumstance feel compelled to stay and answer? This Court answers yes, considering all of the circumstances . . . ." We reject the State's contention that the trial court improperly applied a subjective analysis.

court expressly considered all of the underlying facts, noting the importance that the *Williams* court gave to the verbal exchange between the officer and Williams and further noting that no such equivalent evidence existed in this case.

¶ 20. The State argues that the trial court improperly considered Multer's request that O'Neal exit the vehicle because it occurred prior to the conclusion of the traffic stop. *See Williams*, 255 Wis. 2d 1, ¶ 27 (proper focus of analysis is on the events at the conclusion of the initial seizure and immediately thereafter). Given the proximity in time between the officer's request that O'Neal exit the vehicle, the arrival of the backup deputy and the request to search, we do not view the trial court's consideration of these facts as improper. We fail to comprehend how the trial court's consideration of this fact runs afoul of its obligation to consider "all of the circumstances surrounding the incident." *See Mendenhall*, 446 U.S. at 554 (a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave).

¶ 21. Under the totality of the circumstances, we conclude that a reasonable person in O'Neal's position would not have believed that he or she was free to leave. As stated above, the circumstances underlying O'Neal's consent are very similar to those in *Williams*. While the *Williams* court did not view the tenor of the questioning, the presence of the backup officer, emergency lights, location and time of night as combining to constitute a seizure, *Williams*, 255 Wis. 2d 1, ¶¶ 30–34, it arrived at that conclusion after expressly stating that the fact "[t]hat the officer had just invited Williams to 'get on [his] way' " strongly influenced its decision, *id.*,

787

¶ 29. The *Williams* court concluded that "[t]he officer's words and actions, considered as a whole, communicated permission to leave . . . ." *Id.*

¶ 22. Here, Multer did not sufficiently communicate permission to leave either by word or action. We conclude, as did the trial court, that the absence of that fact from the surrounding circumstances results in a combination of factors that would have led a reasonable person to believe that he or she was not free to leave. Multer asked O'Neal to exit the vehicle, a backup officer was present and standing in front of Multer's squad car during the exchange, at least one squad had its emergency lights activated, and less than a few seconds elapsed between Multer's issuance of a warning and his inquiry regarding illegal items. During that time, Multer never gave any indication that O'Neal was free to leave, either in word or action. Given the seamless transition between the conclusion of the traffic aspects of this case and Multer's accusatory question whether there was anything illegal in the vehicle and his request to search the vehicle, we conclude that a reasonable person would not believe that he or she was free to depart the scene. In light of *Williams* and the particular facts of this case, we conclude that O'Neal was seized for purposes of the Fourth Amendment when he consented to the search of his vehicle.

## *Conclusion*

¶ 23. We conclude that, in view of all of the circumstances surrounding O'Neal's consent, a reasonable person would not have felt free to ignore Multer's questions and request to search the vehicle. Because O'Neal was seized for purposes of the Fourth Amendment at the time he gave consent for the search of his

vehicle, his consent was invalid. We therefore affirm the trial court's order granting O'Neal's and Jones' motions to suppress evidence obtained during the search.

*By the Court.*—Order affirmed.