**Sergio CAMPOS, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 45A03–0605–CR–211.**

Court of Appeals of Indiana.

June 7, 2007.

---

Kathleen M. Sweeney, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ann L. Goodwin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary[1]

Sergio Campos appeals the denial of his motion to suppress evidence obtained during a traffic stop of the car in which he was a passenger. We affirm.

### Issues

Campos raises three issues. We address the two dispositive issues, which we restate as:

I. whether Campos had standing to challenge the search of the vehicle; and

II. whether Campos should have been Mirandized prior to entering the police car.

### Facts

On July 28, 2005, Officer Alfred Villarreal of the Lake County Police Department stopped a car for speeding. Cesar Santiago–Armendariz was the driver, and Campos was the passenger. When Officer Villarreal approached the car, he observed that Santiago–Armendariz's hand was

---

1. We heard oral argument on March 29, 2007, at the University of Southern Indiana in Evansville. We thank the University for its hospitality and commend counsel for the quality of their oral advocacy.

shaking as he "fumbled through some of his paperwork." Tr. p. 17. Officer Villarreal told Santiago–Armendariz that he was issuing a warning for speeding and asked Santiago–Armendariz to come with him to the police car while he wrote the warning.

Officer Villarreal determined the car was registered to Jose Gonzalez and asked Santiago–Armendariz who owned the car. Santiago–Armendariz said it belonged to Campos's brother, Daniel. Officer Villarreal inquired as to the purpose of the trip, and Santiago–Armendariz told him that they had been to an airport. Santiago–Armendariz could not remember which airport and described it as the "small airport" in Chicago. *Id.* at 21. Santiago–Armendariz then gave Officer Villarreal directions to the airport and indicated that he had seen a sign for "Midway Airport." *Id.*

As Officer Villarreal left the police car to obtain Campos's identification, he again asked if the car belonged to Campos's brother. Santiago–Armendariz replied that it did, and the officer asked " 'Is it Jose Gonzalez?' " *Id.* at 23. Santiago–Armendariz responded, " 'Yes.' " *Id.*

When Officer Villarreal approached Campos, Campos told him that he and Santiago–Armendariz had been to O'Hare Airport for an international flight. Officer Villarreal returned to the police car and asked Santiago–Armendariz if he was sure they had been to Midway. Santiago–Armendariz reiterated that they had been to the "small" airport. *Id.* at 27. Officer Villarreal then gave Santiago–Armendariz the warning ticket, returned his identification and paperwork, and told him "he was all set and to be careful in pulling out into traffic." *Id.* The two shook hands and both walked back toward their vehicles.

Before Santiago–Armendariz left, Officer Villarreal asked him if he had any illegal weapons or narcotics in the car.

Santiago–Armendariz said no. Officer Villarreal asked if he could search for those items. Santiago–Armendariz asked if it was necessary, and Officer Villarreal said it was. Santiago–Armendariz said "Okay," and Officer Villarreal told him to have a seat in the police car for his own safety while he searched the car. *Id.*

Officer Villarreal also asked Campos if he could search the car. Campos told him to ask Santiago–Armendariz. The officer said that Santiago–Armendariz had consented, and Campos replied, " 'Okay.' " *Id.* Officer Villarreal asked Campos to have a seat in the back seat of the police car.

Unknown to Campos, a recording device was operating in the police car while he and Santiago–Armendariz were alone in the car, and the two apparently made "damaging admissions." *Id.* at 50. Officer Villarreal's search of the car uncovered 1,246 grams of cocaine in the trunk. The officer handcuffed Santiago–Armendariz and Campos and advised them of their *Miranda* rights.

On July 29, 2005, the State charged Campos with Class A felony dealing in cocaine. Campos moved to suppress the evidence obtained during the search of the car and the recording. After a hearing, the motion was denied. Campos now appeals.

## Analysis

 Our review of the denial of a motion to suppress is similar to other sufficiency matters. *Richardson v. State*, 848 N.E.2d .1097, 1100 (Ind.Ct.App.2006), *trans. denied.* We must determine whether substantial evidence of probative value exists to support the trial court's ruling. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's decision. *Id.* at 1100–01. "However, unlike the typical suf-

ficiency of the evidence case where only the evidence favorable to the judgment is considered, we also consider the uncontested evidence favorable to the defendant." *Id.* We will affirm the trial court's ruling if it is sustainable on any legal grounds apparent in the record. *Id.*

### I. Standing

■■■ Campos argues that, contrary to the trial court's ruling, he had standing to challenge the search of the car under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. In determining whether a person's Fourth Amendment rights have been violated, the Supreme Court has determined that that decision is more properly placed within the purview of substantive Fourth Amendment law than within the purview of standing. *Willis v. State,* 780 N.E.2d 423, 427 (Ind.Ct.App.2002) (citing *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978)). The Supreme Court has rejected the rubric of the standing doctrine when analyzing Fourth Amendment claims and has determined that a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched, and that the expectation is reasonable. *Id.* (citing *Minnesota v. Carter,* 525 U.S. 83, 87–88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998)). The burden is on the defendant challenging the constitutional validity of a search to demonstrate that he or she had a legitimate expectation of privacy in the premises searched. *State v. Friedel,* 714 N.E.2d 1231, 1236 (Ind.Ct.App.1999).

Campos, the passenger of the car, argues that he "had been given permission by his brother-in-law to drive/have the car and take it out of state." Appellant's Br. p. 11. This assertion, however, is not supported by his citations to the record, and we find no support for such in the record. In fact, there is very little evidence regarding the ownership of the car—just Santiago–Armendariz's statements, which were conflicting, that the car belonged to Campos's brother. These statements alone do not support Campos's argument that his brother-in-law had given him permission to use the car. In the absence of such evidence, Campos was simply a passenger in a car driven by Santiago–Armendariz. Campos has not shown that he had an expectation of privacy in the trunk of that car.

■■■ Campos also argues that he had standing to challenge the search under the Indiana Constitution, which has retained a separate standing requirement. *Willis,* 780 N.E.2d at 427. "While the Fourth Amendment inquiry focuses largely on the defendant's privacy expectation in the premises searched, cases interpreting our state constitution focus both on the premises searched and the defendant's interest in the property seized." *Mays v. State,* 719 N.E.2d 1263, 1267 (Ind.App.Ct.1999), *trans. denied.* Specifically, "to challenge evidence as the result of an unreasonable search or seizure under Article I, Section 11, a defendant must establish ownership, control, possession, or interest in either the premises searched or the property seized." *Peterson v. State,* 674 N.E.2d 528, 534 (Ind.1996). "If the facts fail to establish that the alleged illegal search and seizure actually concerned the person, house, papers or effects of the defendant, he will not have standing to challenge the illegality." *Id.*

As we have discussed, there is no evidence that Campos had any ownership, control, possession, or interest in the car that was searched other than simply as a passenger. He argues, however, "the State cannot charge Campos with knowingly possessing drugs found in the trunk

of the car of [sic] he had lawful possession and then claim, for purposes of standing, he had no possessory interest in the items seized." Appellant's Br. p. 11.

First, if we adopted Campos's "automatic standing" argument, we would essentially be eliminating the standing doctrine as it relates to possessory offenses because a defendant charged with such crimes would always have standing to challenge the seizure under the Indiana Constitution based solely on the charges pending against him or her. The nature of the charges alone, not the facts of the case, would eliminate the defendant's obligation to establish ownership, control, possession, or interest in either the premises searched or the property seized prior to challenging the illegality. *See Peterson*, 674 N.E.2d at 534.

Further, the doctrine of "automatic standing" has been rejected for purposes of the Fourth Amendment.[2] *See Livingston v. State*, 542 N.E.2d 192, 194 (Ind. 1989); *Robles v. State*, 510 N.E.2d 660, 663 (Ind.1987) ("[M]ere possession of a searched item does not confer automatic standing to challenge the search on Fourth Amendment grounds, albeit that possession, as in this case, is sufficient to establish criminal culpability."), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907. In *Livingston*, the defendant argued that to establish standing under the Fourth Amendment, "a person must thus risk admitting guilt to the crime to establish standing to challenge the search which produced the narcotics he is charged with

possessing." *Livingston*, 542 N.E.2d at 193. Citing *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), in which the Supreme Court held that a defendant's testimony given at a hearing on a motion to suppress evidence on Fourth Amendment grounds was not admissible at trial as evidence of the defendant's guilt, our supreme court concluded that Livingston's dilemma was rendered nonexistent. *Id.* at 194. Based on this reasoning, Campos's argument fails.[3]

 Finally, even if Campos had argued that he had standing to challenge to the stop, the trial court properly denied the motion to suppress. Indeed, every person in a motor vehicle has the right to contest the stop of the vehicle in which he or she is traveling as either a driver or passenger. *Osborne v. State*, 805 N.E.2d 435, 439 (Ind.Ct.App.2004), *trans. denied*. However, police can briefly detain an individual for investigatory purposes without a warrant if, based on specific and articulable facts, the officer has reasonable suspicion that criminal activity may be afoot. *Scott v. State*, 855 N.E.2d 1068, 1072 (Ind. Ct.App.2006) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). "Reasonable suspicion entails some minimal level of objective justification for making a stop, something more than an unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause." *Id.* "Even if the stop is justified, a reasonable suspicion only allows the officer to temporarily

---

2. In *U.S. v. Salvucci*, 448 U.S. 83, 92–93, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980), the Supreme Court rejected "blind adherence" to the other underlying assumption that possession of the seized goods is an acceptable measure of Fourth Amendment interests and engaged in a conscientious effort to apply the Fourth Amendment by asking not merely whether the defendant had a possessory interest in the items seized, but whether he or she had an expectation of privacy in the area searched.

3. Because Campos does not have standing to challenge the search, we need not address his argument that his consent to search was invalid.

freeze the situation for inquiry and does not give him all the rights attendant to an arrest." *Id.* To determine the validity of a stop, we consider the totality of the circumstances. *Id.* at 1072–73.

■■■■ Campos does not argue that Officer Villarreal did not have reasonable suspicion to stop the car for speeding. He argues, however, that it was only after Officer Villarreal completed the traffic stop that he asked for consent to search and that there was not reasonable suspicion "to detain the car and Campos as well as to seek consent to search." [4] Appellant's Br. p. 16.

In support of his argument, Campos relies on *Tumblin v. State*, 736 N.E.2d 317, 319 (Ind.Ct.App.2000), *trans. denied*, which involved a patdown search of a passenger of a car after a traffic stop was completed. In *Tumblin*, the record established that "Officer Trimble fully concluded the routine traffic stop without any indication of illegal activity beyond traffic infractions. He admitted that the purpose of his initial stop had been completed and the vehicle occupants were 'free to go' before he inquired as to drugs or weapons." *Tumblin*, 736 N.E.2d at 322. We concluded that the search and seizure were constitutionally infirm and reversed Tumblin's conviction. *Id.* at 323.

Unlike in *Tumblin*, here, Officer Villarreal testified that after he issued the warning, returned Santiago–Armendariz's pa-

perwork, and told him to be careful pulling out, Santiago–Armendariz and Campos were free to go only "[i]n their mind[s]." Tr. p. 29. Further, although Officer Villarreal testified that at that point he did not have any business left regarding the traffic infraction, he already had reasonable suspicion to further detain Santiago–Armendariz and Campos. The detailed and inconsistent stories from Santiago–Armendariz and Campos regarding which airport they had been to, Santiago–Armendariz's inconsistent statements regarding the name of the owner of the car, and Santiago–Armendariz's demeanor justified the continuation of the stop.

Based on the totality of the circumstances, there was not a separate and distinct stop unsupported by reasonable suspicion. This was a single ongoing stop continuously supported by reasonable suspicion.[5]

## II. Miranda

■■■■ Campos also argues that he should have been Mirandized when he entered the police car with Santiago–Armendariz because he was in custody. *Miranda* warnings are only required when a suspect is subject to custodial interrogation. *See King v. State*, 844 N.E.2d 92, 96 (Ind.Ct.App.2005). Because Officer Villarreal was not in the police car or questioning Campos when he made incriminating statements, there was no interrogation. Campos has not established that the state-

---

4. Campos concedes, and the State agrees, that he "did not raise this basis at the trial level." Appellant's Br. p. 13 n. 1. To the extent we address this issue, we do so because it was sufficiently raised in his motion to suppress, not because Indiana Appellate Rule 14(B) allowed him to raise it for the first time on appeal as Campos asserts.

5. Campos argues, "Under the Indiana constitution, the officer's conduct in detaining the car and Campos, and seeking consent to

search were not reasonable given the totality of the circumstances." This statement alone is not sufficient to establish a separate claim that the stop was invalid based on the Indiana Constitution. *See Richardson v. State*, 800 N.E.2d 639, 647 (Ind.Ct.App.2003) ("Richardson's failure to cite any authority or to make any separate argument specific to the state constitutional provision waives the state constitutional argument on appeal."), *trans. denied*.

ments were recorded in violation of the Fifth Amendment rights.[6]

## Conclusion

The trial court properly denied Campos's motion to suppress because Campos did not have standing to challenge the search and he did not have to be informed of his *Miranda* rights prior to entering the police cruiser. We affirm.

Affirmed.

VAIDIK, J., concurs.

MAY, J., dissents with separate opinion.

MAY, Judge, dissenting.

I believe Campos undoubtedly has standing to challenge the subsequent stop of the vehicle after the traffic stop for speeding had been concluded.[7] The second stop was unsupported by any suspicion independent of the original stop and was therefore illegal.[8] Therefore, the search that arose out of the illegal stop violated Campos' Fourth Amendment pro-

tections against unreasonable search and seizure.

I would not, in the case before us, rely on the doctrine of standing to immunize police from the Fourth Amendment's exclusionary rule when the police behavior was this egregious; the officer obtained consent to a search by stating it was "necessary" after an improper second stop, which stop was unsupported by independent suspicion.

Furthermore, after the illegal second stop the police failed to advise Campos he had the right to consult a lawyer before consenting to a search. This serves as an independent ground for exclusion of the evidence obtained as a result of the illegal second stop. I must therefore respectfully dissent.

As the majority acknowledges, a passenger may challenge the *stop* of a vehicle in situations when he could not challenge a search. *See Osborne*, 805 N.E.2d at 439 (a person has no standing to object to a

---

**6.** To the extent Campos argues that his Fourth Amendment rights were violated, we simply cannot agree with his assertion that he had a reasonable expectation of privacy in the backseat of a police car.

**7.** This process is known as a "Badger"—a police interdiction technique by which an officer attempts to obtain consent to a search even though the officer has no legal basis to further detain the person he has stopped. *See State v. Jones,* 278 Wis.2d 774, 693 N.W.2d 104, 107 (App.2005), *review denied* 282 Wis.2d 720, 700 N.W.2d 272 (2005). There, an officer stopped the vehicle in which Jones was a passenger for speeding. The officer asked defendants for their identification, then ran checks on the identifications and the vehicle license plate. The checks did not reveal anything irregular or suspicious. The officer wrote a warning citation for the driver. The officer asked the driver to accompany him to the rear of the vehicle, where the officer explained the warning citation to him. The officer returned both identification cards.

Seconds later, the officer asked the driver if there was anything illegal in the car. The driver said no and the officer then asked to search the vehicle. The officer found cocaine and a weapon, and arrested Jones and the driver. The trial court granted Jones' motion to suppress the evidence the officer obtained from the "Badger" interdiction. The *Jones* court affirmed, on the ground the driver was "seized" when he consented to the search.

**8.** As the State acknowledges in its own Statement of the Facts, "[a]ll business concerning the traffic stop was concluded," (Br. of Appellee at 4), before the officer told Santiago–Armendariz a search of his car was "necessary." The officer handed the driver the warning ticket, returned his identification, told him he was "all set," and to be careful pulling out into traffic. As explained below, under these undisputed facts I cannot join the majority's statement "[t]his was a single ongoing stop continuously supported by reasonable suspicion." (Op. at 682.) Rather, Campos was subjected to an illegal "second stop."

search of a car based merely on the fact he or she was a passenger at the time of the search, but every person in a motor vehicle has a right to contest the stop of the vehicle in which he is traveling as either a driver or passenger).

Campos has such standing because he was subjected to an illegal "second stop" after the initial traffic stop was concluded. The officer told Santiago–Armendariz a search of the car was "necessary" even though neither Santiago–Armendariz nor Campos had done anything after the completion of the stop to give the officer reasonable suspicion that further investigation was necessary. Campos was "unlawfully detained beyond the parameters of a routine traffic stop," *Tumblin,* 736 N.E.2d at 323, and "[t]he ensuing search and seizure were constitutionally infirm." *Id.* As the evidence against Campos was obtained through an unlawful search, it cannot be used against him. *See id.*

An automobile passenger's standing was explained in *Delaware v. Prouse,* 440 U.S. 648, 662–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979):

> An individual operating *or traveling in* an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.... Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.

(Emphasis supplied.) An investigatory stop may be made only if the police officer has a reasonable suspicion grounded in specific facts that further investigation is necessary. *McKnight v. State,* 612 N.E.2d 586, 588 (Ind.Ct.App.1993) (citing *Prouse,* 440 U.S. at 662–63, 99 S.Ct. 1391), *reh'g denied, trans. denied.* In evaluating the validity of a stop, the totality of the circumstances must be considered. *Id.*

In *McKnight,* an officer was dispatched to a fight. About two blocks from the fight scene, he saw a car in which McKnight was a passenger traveling at a high rate of speed. When it did not come to a complete stop at a stop sign, the officer stopped the vehicle and asked the driver why he was driving so fast. The driver responded he was in a hurry to go home because he knew he was in violation of curfew. At that time, the officer received a radio call that the fight was going on and he had to go there. The officer told the driver and McKnight to go home. He then went to the fight scene.

Upon arriving, the officer learned several of the fight participants had fled the scene in a large vehicle. Recalling his earlier stop of the vehicle in which McKnight was riding he decided to stop it again. When he did so, he knew the occupants were violating curfew. He suspected the occupants had participated in the fight.

As the officer approached the automobile to question the occupants, he saw McKnight stuff something under his seat. The officer ordered the driver and McKnight to get out of the vehicle. He arrested them for violating curfew. In an inventory search of the vehicle he found cocaine. Some was under McKnight's seat and some was on the floorboard in front of his seat.

McKnight contended the stop was illegal under the reasoning of *People v. Fox,* 203 Ill.App.3d 742, 148 Ill.Dec. 826, 561 N.E.2d 132 (1990). Police stopped Fox because he was speeding. Later, a second stop was made because the same trooper noted the way Fox tugged on his jacket during the first stop and suspected Fox might have a weapon hidden under his jacket. The *Fox* court found the evidence from the second

stop should have been suppressed, noting there must be separate justification for a second stop. *Id.* 148 Ill.Dec. 826, 561 N.E.2d at 134.

The police officer told Fox "he hadn't done anything wrong the second time, but from the actions that he did in my car [during the first stop], it made me nervous." *Id.* 148 Ill.Dec. 826, 561 N.E.2d at 133. The court determined there was no independent reason for the second stop.

In *McKnight* we distinguished the *Fox* facts:

> Due to the confluence of a number of factors, including the lateness of the hour, the emptiness of the streets, the proximity of [the car] to the fight scene, the speed with which [the driver] was driving in the vicinity of the fight scene, and the information that some of the combatants had fled in a large vehicle, the officer had a reasonable suspicion that the driver and McKnight were participants in the fight.... Furthermore, this suspicion was independent of the initial stop. Therefore, any objection to the admission of the evidence garnered from the second stop would have been fruitless.

612 N.E.2d at 588.

In *Fox,* by contrast, Fox was stopped for speeding. He accompanied the officer to his squad car, where the officer wrote a speeding ticket. Before Fox entered the squad car, the officer took a hunting knife Fox was carrying. After writing the speeding ticket, the officer returned Fox's knife and Fox left. The officer continued to follow Fox, and after Fox traveled two or three miles, the officer flashed his headlights and motioned for Fox to pull over. Fox testified the officer "grabbed my arm and up under my vest and started ... reaching, grabbing." 148 Ill.Dec. 826, 561 N.E.2d at 133. The officer removed a pistol from the waistband of Fox's pants and placed him under arrest.

While writing the speeding citation, the officer had noticed Fox tugged at his vest three times as he sat in the patrol car. The officer stated, "I was somewhat curious but I didn't feel at that time I had reason enough to go ahead and search his person." *Id.* The officer said he stopped Fox the second time because:

> After [Fox] got out of my vehicle, I was curious so I watched his movements. After he got out of the car, he buttoned his vest up and it made it snug around his waistband. I noticed a small bulge on his waistband on the rear left side and that made me even more curious, but it wasn't large enough to be what I perceived to be a gun. At that time, he got back on his motorcycle and I followed him between a quarter and an eighth of a mile. It wasn't a long distance. After he got on the motorcycle, he reached back to the spot where the bulge was and did what I do when I carry my weapon off duty to adjust it so it is less visible for a period of probably three to four seconds, and that's when I decided to stop him again and check the area.

*Id.*

The officer testified that before stopping Fox the second time he "felt reasonably sure" Fox had a weapon. *Id.* The officer stated that when he searched Fox, he believed Fox to be dangerous because Fox had earlier stated he was carrying a knife because he was going to pick up a truck for a friend, and he "expected some trouble." *Id.*

The *Fox* court determined the second stop was an incident separate and apart from the original and legitimate stop for a traffic violation, and noted the officer would have been justified in conducting a pat-down search for weapons in connection

with the traffic arrest. *Id.* 148 Ill.Dec. 826, 561 N.E.2d at 134. However, once that transaction was completed and Fox was allowed to leave, these safety considerations were no longer relevant and any further intrusion on Fox's Fourth Amendment right of privacy had to be "separately justified." *Id.* That is, to justify the second stop the officer had to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

By the officer's own admission, Fox's act during the first stop of tugging at his vest made the officer "somewhat curious," but did not give him reason enough to search Fox while Fox was in the patrol car. Similarly, the officer discounted the small bulge he saw during the first stop at Fox's waistband because it "wasn't large enough to be what I perceived to be a gun." *Id.* 148 Ill.Dec. 826, 561 N.E.2d at 135. It was only after following Fox for some distance on the highway and seeing him reach behind to the area of the bulge in his vest and make an adjustment that the officer decided to "stop him again and check the area." *Id.* The officer testified Fox's gesture was similar to what he himself did when adjusting his weapon to make it less visible. However, as the trial court stated, the gesture was "equally consistent with innocent behavior," *e.g.,* adjusting one's clothing for better wind resistance while riding. *Id.* The officer's conclusion that Fox was carrying a weapon was therefore more a mere suspicion or hunch than a rational inference from the facts. Mere suspicions of the police are not sufficient to establish the reasonableness of a stop. As the officer's stop of Fox was unreasonable, his subsequent search for weapons was impermissible. *Id.*

In the case before us, there was even less of a "separate justification" for the "second stop" of Campos and Santiago–Armendariz after the traffic stop was concluded and they were told they were "all set." The officer apparently did not have "reason enough to search," *id.* 148 Ill.Dec. 826, 561 N.E.2d at 133, Santiago–Armendariz, Campos, or the car during the initial traffic stop. And unlike Fox, neither Santiago–Armendariz nor Campos did anything suspicious after the officer concluded the traffic stop. Because the officer had no "suspicion . . . independent of the initial stop," *McKnight,* 612 N.E.2d at 588, the "second stop" of Santiago–Armendariz and Campos was illegal, and Campos has standing to challenge it.

Campos' challenge to the stop would have been successful. The officer unlawfully detained Campos and Santiago–Armendariz when he told Santiago–Armendariz a search of the car was "necessary" after he completed the traffic stop. We addressed detention "beyond the parameters of" a traffic stop in *Tumblin,* 736 N.E.2d at 322. A police officer stopped a car in which Tumblin was a passenger for speeding. Neither the driver nor Tumblin was wearing a seat belt. The officer issued a verbal warning to the driver about the traffic infractions, then asked if there were drugs or weapons in the car. The driver said no and assented to the officer's request to search the vehicle. The officer directed the driver and Tumblin to submit to a patdown search, which revealed Tumblin had a gun. He failed to produce a license to carry it and was convicted of Carrying a Handgun Without a License.

We concluded Tumblin was "unlawfully detained beyond the parameters of a routine traffic stop. The ensuing search and seizure were constitutionally infirm. Tumblin's conviction, based on evidence obtained through an unlawful search, cannot

stand." *Id.* at 323. We found the officer had fully concluded a routine traffic stop without any indication of illegal activity beyond traffic infractions. There, as in the case before us, the purpose of his initial stop had been completed and the vehicle occupants were led to believe they were free to go before the officer inquired as to drugs or weapons. The officer's testimony did not indicate either the driver or Tumblin evinced hostility, threatened him in any way, or made movements toward any area where a weapon could have been secreted.

In *Tumblin* we reviewed a number of decisions that addressed whether a police officer may routinely question a person lawfully detained for a traffic violation about the presence of weapons. We found courts have permitted such questioning in two situations: if the questioning was necessary for officer safety and if the officer's question was reasonably related to the reason for the stop. *Id.* at 321. Accordingly, the officer was justified in asking Tumblin about weapons, which inquiry led to the vehicle search and patdown, only if he reasonably believed his safety was threatened or his inquiry was reasonably related to the basis of the initial stop. Because the initial stop was premised on minor traffic infractions, we focused exclusively on the safety justification. *Id.*

We concluded "the record herein does not disclose specific facts that caused [the officer] to entertain a reasonable fear for his safety in issuing a citation or making an arrest." *Id.* at 322. We noted a vague and general characterization of demeanor, such as "nervousness," does not rise to the level of reasonable suspicion. *Id.* The officer's testimony at most indicated his general suspicion that a patdown search of Tumblin would yield incriminating evi-

dence. Such a "general exploratory search" violates the Fourth Amendment. *Id.*

Campos' situation is similar to Tumblin's, and the officer's search after telling Santiago–Armendariz such was "necessary" was improper under either *Tumblin* rationale. As in *Tumblin,* the purpose of the initial traffic stop had been completed. Campos and Santiago–Armendariz were told they were "all set" before the officer told Santiago–Armendariz it was "necessary" that he search the car in which Campos was a passenger. The record does not reflect either Santiago–Armendariz or Campos evinced hostility or threatened the officer in any way, or that their fidgeting included furtive hand movements toward any area where a weapon could have been secreted.

Having determined the second stop was illegal and Campos had standing to challenge it, I would also find Campos was in custody when the officer asked for his consent[9] to search the car. The officer was therefore obliged to advise Campos he had the right to consult a lawyer. This serves as an independent ground for exclusion of the evidence obtained as a result of the illegal "second stop."

Our Supreme Court held in *Pirtle v. State,* 263 Ind. 16, 29, 323 N.E.2d 634, 640 (1975), that a person who is asked to consent to a search while in police custody is entitled to the presence and advice of counsel before deciding whether to consent. Because Pirtle was not afforded counsel after he requested it, he "could have no conception of the extent of his Fourth Amendment rights." *Id.* at 28, 323 N.E.2d at 640.

The officer did not advise Campos of his *Pirtle* rights. The State argues no such

---

9. The State does not explain why the officer was seeking "consent" from the passenger Campos, who the State now asserts had no standing to object to a search anyway.

advisement was required because Campos was not in custody. He was. A person is "in custody" if a reasonable person under the same circumstances would believe he was under arrest or not free to resist the entreaties of the police. *Sellmer v. State,* 842 N.E.2d 358, 363 (Ind.2006).[10]

There, the officer asked Sellmer between three and five times for permission to search her car before securing her consent. "We think that a reasonable person, asked the same question over and over and over again, might well conclude that she was not free to give the police a negative answer." *Id.* at 364. The officer told Sellmer he "was needing to speak with her and it was in reference to a phone conversation which was received by our dispatcher and that there was a large amount of illegal drugs in it. And then [he] asked her directly at that point in time if she knew anything about that." *Id.* The Court noted "a reasonable person, asked repeatedly if he or she knew why the police had received a report of a large quantity of contraband in his or her car, might well conclude either that he or she was under arrest or, at least, that she was not free to deny police permission to search her car." *Id.*

In trying to convince Sellmer to give him permission to search her car, the officer told her "It's in your best interest to cooperate with us and not make us jump through a bunch of hoops." *Id.*

> We think that a reasonable person, told by a police officer that it would be in the person's "best interest" not to require the police to "jump through a bunch of hoops," might well conclude that the consequence of denying the police per-

mission to search her car might be arrest or, at least, detention during whatever time it would take for the police to jump through the hoops. *Id.*[11]

The officer also stated: "If you have nothing to hide here, and the information we have been given is not true, I'm going to thank you for your time and allow you to go on your way." *Id.* A reasonable person, told by a police officer she could go on her way if she permitted the police to search her car and no contraband was discovered, might well conclude she was not free to go until a search was conducted. *Id.* at 364–65.

Sellmer asked the officer, "Do I have to let you [search my car]?" *Id.* The officer did not tell Sellmer she did not have to let him search and had the right to refuse. Instead, he again said, "It would be in your best interest to cooperate if you have nothing to hide." *Id.* at 365. A reasonable person who asks that question and, rather than being told she did not have to consent to the search was instead told it would be in her best interest to consent, would conclude she had no practical alternative but to consent. *Id.*

The Court noted it was applying a "totality of the circumstances" test, and none of the factors taken alone "or, in all likelihood, several of them taken together," would cause it to conclude a reasonable person under the same circumstances would believe she was under arrest and not free to resist the entreaties of the police. However,

> given the extensive efforts [the officer] went to ... to persuade Sellmer to consent and to avoid advising her that she

**10.** The State does not acknowledge the *Sellmer* facts, analysis, or result.

**11.** The Court also noted such a reasonable person might well conclude that even if she

refused, her car would be searched anyway "as soon as the police finished jumping through the hoops." *Id.*

was not required to consent even in the face of her direct questions, we conclude that a reasonable person under the same circumstances as those in which Sellmer found herself would believe either that she was under arrest or, at least, that she was not free to resist the entreaties of the police.

*Id.* As such, Sellmer was entitled to a Pirtle advisement and the trial court should have granted her motion to suppress the evidence seized in the search of her car.

A different situation presented itself in *Jones,* 655 N.E.2d at 49. There, Jones was not in custody when he consented to the search of his vehicle. The number of officers present for Jones' traffic stop was unusually high, but none of the officers touched or physically restrained Jones before he consented to a search of his car. Jones was not asked incriminating questions. He was never in the "care and control" of the police or interrogated in a manner implicating the Fifth Amendment and necessitating the giving of *Miranda* warnings. *Id.* at 56. Had Jones refused to give the police permission to search, he would have been given two citations and been free to leave. The officer told Jones he did not have to let the officer search and he had the right to refuse, but Jones reaffirmed, saying, "Go ahead." *Id.* at 53.

The case before us is more like *Sellmer* than *Jones.* When the officer sought consent to the search, neither Campos nor Santiago–Armendariz was told he could decline to consent. Instead, the officer told Santiago–Armendariz the search was "necessary," (Tr. at 31), and he obtained Campos' consent based on Santiago–Ar-

mendariz's consent to the "necessary" search.[12] Like in *Sellmer,* the officer asked Campos and Santiago–Armendariz the same questions multiple times—here, about where they had been and who owned the car. After telling Santiago–Armendariz the search was "necessary" he told Santiago–Armendariz and Campos to remain in the police car as he searched the car in which Campos had been riding. He asked Campos for his identification even though the stop was ostensibly because the *driver* committed a traffic violation.

Campos was in custody after the officer told Santiago–Armendariz, even though the traffic stop had been completed, the search was "necessary." Campos was accordingly entitled to a *Pirtle* advisement.

Our Supreme Court and this court have consistently condemned "fishing expeditions" such as that to which Santiago–Armendariz and Campos were subjected. *See, e.g., Litchfield v. State,* 824 N.E.2d 356, 364 (Ind.2005) ("Allowing random searches, or searches of those individuals whom the officers hope to find in possession of incriminating evidence gives excessive discretion to engage in fishing expeditions.").

In *State v. Tucker,* 588 N.E.2d 579 (Ind. Ct.App.1992), we held a seizure of evidence from Tucker's automobile could not be justified as a result of a purported "inventory search" where the search was conducted as part of an investigation by officers who were told to look for evidence and to impound the automobile and do an inventory search if they found anything. "We will not countenance such fishing expeditions. An illegal search, though it be called an

---

**12.** The State asserts Santiago–Armendariz's conversation with the officer about consent is "irrelevant to *Campos'* consent." (Br. of Appellee at 17) (emphasis in original). The State does not acknowledge in that argument the undisputed evidence that when Campos consented he was deferring to Santiago–Armendariz, who had already consented because it was "necessary" he do so.

inventory search, is still an illegal search." *Id.* at 581.

We reached a similar result in *Sanders v. State*, 576 N.E.2d 1328 (Ind.Ct.App. 1991). Police officers were watching Sanders because an informant had reported Sanders would be driving a gold Cadillac and was "possibly in possession of some narcotics at that time." *Id.* at 1329. Police made no attempt to establish the trustworthiness of that information. The officers pulled Sanders over because he did not to use his turn signal, not because they had probable cause to believe he had committed a crime. Sanders and his passenger were asked to leave the car and police searched it.

The State argued the search was necessary to ensure the officers' safety. There, as in the case before us, there was "absolutely no indication that the officers reasonably believed they were in danger." *Id.* Instead,

> [t]his was a case in which the officers went on a fishing expedition and discovered marijuana. As our supreme court has stated: "It will be a sad day indeed when this court sanctions the detention and search of persons and their property on the mere allegation that they are of suspicious character." The State has not demonstrated that it had probable cause to believe Sanders had committed a crime, or that a search of the vehicle was necessary for the safety of the officers. The evidence admitted at trial was obtained through an illegal search, and was thus inadmissible.

*Id.* at 1330 (citation omitted).

The evidence against Campos was obtained through such a "fishing expedition" in the form of the illegal "second stop." The officer improperly stated consent to a search of the car was "necessary," even though no reasonable suspicion arose after the completion of the traffic stop. I would therefore reverse the denial of Campos' motion to suppress.